80 F.3d 716
 64 USLW 2620
 Timothy E. QUILL, M.D.; Samuel C. Klagsbrun, M.D.; and
Howard A. Grossman, M.D., Plaintiffs-Appellants,
v.
Dennis C. VACCO, Attorney General of the State of New York;
George E. Pataki, Governor of the State of New
York; Robert M. Morgenthau, District
Attorney of New York County,
Defendants-Appellees.
 No. 60, Docket 95-7028.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 1, 1995.
Decided April 2, 1996.
 
 Kathryn L. Tucker, Perkins Coie, Seattle, WA, and Carla A. Kerr, Hughes Hubbard & Reed, New York City (David J. Burman, Thomas L. Boeder, Kari Anne Smith, Perkins Coie, Seattle, WA, Leigh A. Roveda, Hughes Hubbard & Reed, New York City, of counsel), for Plaintiffs-Appellants.
 Michael Popkin, Assistant Attorney General, New York City (Dennis C. Vacco, Attorney General of the State of New York, Victoria Graffeo, Solicitor General, Kathie Ann Whipple, Acting Bureau Chief, Litigation Bureau, Susan L. Watson, Assistant Attorney General, of counsel), for Defendants-Appellees.
 Marc Frazier Scholl, Assistant District Attorney, New York City (Robert M. Morgenthau, District Attorney of New York County, Marc Dwyer, Assistant District Attorney, of counsel), for Defendant-Appellee Robert M. Morgenthau.
 (Michael L. Costello, New York State Catholic Conference, Albany, NY, Mark E. Chopko, Michael F. Moses, United States Catholic Conference, Washington, DC, of counsel), for United States Catholic Conference and New York State Catholic Conference as amici curiae.
 (Michael Tierney, New York City, of counsel), for New York State Right to Life Committee, Inc. as amicus curiae.
 (James Bopp, Jr., Richard E. Coleson, Bopp, Coleson & Bostrom, Terre Haute, IN, of counsel), for The National Right To Life Committee, Inc. as amicus curiae.
 (Paul Benjamin Linton, Clarke D. Forsythe, Americans United for Life, Chicago, IL, of counsel), for Members of the New York State Legislature as amici curiae.
 (Cameron Clark, Claudia L. Hammerman, New York City, of counsel), for Lambda Legal Defense and Education Fund, Inc., National Association of People with AIDS, Unitarian Universalist Association, Americans for Death with Dignity, Death with Dignity Education Center, Gray Panthers Project Fund, Hemlock Society, and Minna Barrett as amici curiae.
 Before MINER and CALABRESI, Circuit Judges, and POLLACK, Senior District Judge.*
 MINER, Circuit Judge.
 
 
 1
 Plaintiffs-appellants Timothy E. Quill, Samuel C. Klagsbrun and Howard A. Grossman appeal from a summary judgment entered in the United States District Court for the Southern District of New York (Griesa, Ch. J.) dismissing their 42 U.S.C. § 1983 action against defendants-appellees. The action was brought by plaintiffs-appellants, all of whom are physicians, to declare unconstitutional in part two New York statutes penalizing assistance in suicide. The physicians contend that each statute is invalid to the extent that it prohibits them from acceding to the requests of terminally-ill, mentally competent patients for help in hastening death. In granting summary judgment in favor of defendants-appellees, the district court considered and rejected challenges to the statutes predicated upon the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. Quill v. Koppell, 870 F.Supp. 78 (S.D.N.Y.1994). We reverse in part, holding that physicians who are willing to do so may prescribe drugs to be self-administered by mentally competent patients who seek to end their lives during the final stages of a terminal illness.
 
 BACKGROUND
 
 2
 The action giving rise to this appeal was commenced by a complaint filed on July 20, 1994. The plaintiffs named in that complaint were the three physicians who are the appellants here and three individuals then in the final stages of terminal illness: Jane Doe (who chose to conceal her actual identity), George A. Kingsley and William A. Barth. The sole defendant named in that complaint was G. Oliver Koppell, then the Attorney General of the State of New York. He has been succeeded as Attorney General by Dennis C. Vacco, who has been substituted for him as an appellee on this appeal. According to the complaint, Jane Doe was a 76-year-old retired physical education instructor who was dying of thyroid cancer; Mr. Kingsley was a 48-year-old publishing executive suffering from AIDS; and Mr. Barth was a 28-year-old former fashion editor under treatment for AIDS. Each of these plaintiffs alleged that she or he had been advised and understood that she or he was in the terminal stage of a terminal illness and that there was no chance of recovery. Each sought to hasten death "in a certain and humane manner" and for that purpose sought "necessary medical assistance in the form of medications prescribed by [her or his] physician to be self-administered."
 
 
 3
 The physician plaintiffs alleged that they encountered, in the course of their medical practices, "mentally competent, terminally ill patients who request assistance in the voluntary self-termination of life." Many of these patients apparently "experience chronic, intractable pain and/or intolerable suffering" and seek to hasten their deaths for those reasons. Mr. Barth was one of the patients who sought the assistance of Dr. Grossman. Each of the physician plaintiffs has alleged that "[u]nder certain circumstances it would be consistent with the standards of [his] medical practice" to assist in hastening death by prescribing drugs for patients to self-administer for that purpose. The physicians alleged that they were unable to exercise their best professional judgment to prescribe the requested drugs, and the other plaintiffs alleged that they were unable to receive the requested drugs, because of the prohibitions contained in sections 125.15(3) and 120.30 of the New York Penal Law, all plaintiffs being residents of New York.
 
 
 4
 Section 125.15 of the New York Penal Law provides in pertinent part:
 
 
 5
 A person is guilty of manslaughter in the second degree when:
 
 
 6
 ....
 
 
 7
 3. He intentionally ... aids another person to commit suicide.
 
 
 8
 A violation of this provision is classified as a class C felony. Id.
 
 
 9
 Section 120.30 of the New York Penal Law provides:
 
 
 10
 A person is guilty of promoting a suicide attempt when he intentionally ... aids another person to attempt suicide.
 
 
 11
 A violation of this provision is classified as a class E felony. Id.
 
 
 12
 Count I of the complaint included an allegation that "[t]he Fourteenth Amendment guarantees the liberty of mentally competent, terminally ill adults with no chance of recovery to make decisions about the end of their lives." It also included an allegation that
 
 
 13
 [t]he Fourteenth Amendment guarantees the liberty of physicians to practice medicine consistent with their best professional judgment, including using their skills and powers to facilitate the exercise of the decision of competent, terminally ill adults to hasten inevitable death by prescribing suitable medications for the patient to self-administer for that purpose.
 
 
 14
 Count II of the complaint included an allegation that
 
 
 15
 [t]he relevant portions of ... the New York Penal Law deny the patient-plaintiffs and the patients of the physician-plaintiffs the equal protection of the law by denying them the right to choose to hasten inevitable death, while terminally ill persons whose treatment includes life support are able to exercise this choice with necessary medical assistance by directing termination of such treatment.
 
 
 16
 In their prayer for relief the plaintiffs requested judgment declaring the New York statutes complained of constitutionally invalid and therefore in violation of 42 U.S.C. § 1983 "as applied to physicians who assist mentally competent, terminally ill adults who choose to hasten inevitable death." Plaintiffs also sought an order permanently enjoining defendants from enforcing the statutes and an award of attorney's fees.
 
 
 17
 By order to show cause filed on September 16, 1994, the plaintiffs moved for a preliminary injunction to enjoin then-Attorney General Koppell "and all persons acting in concert and participation with him from enforcing New York Penal Law sections 125.15(3) and 120.30 against physicians who prescribe medications which mentally competent, terminally ill patients may use to hasten their impending deaths." A declaration by each of the plaintiffs was submitted in support of the application, although Jane Doe had died prior to the filing of the order to show cause. Plaintiffs Kingsley and Barth were then in the advanced stages of AIDS and therefore sought an immediate determination by the district court.
 
 In her declaration, Jane Doe stated:
 
 18
 I have a large cancerous tumor which is wrapped around the right carotid artery in my neck and is collapsing my esophagus and invading my voice box. The tumor has significantly reduced my ability to swallow and prevents me from eating anything but very thin liquids in extremely small amounts. The cancer has metastasized to my plural [sic] cavity and it is painful to yawn or cough.... In early July 1994 I had the [feeding] tube implanted and have suffered serious problems as a result.... I take a variety of medications to manage the pain.... It is not possible for me to reduce my pain to an acceptable level of comfort and to retain an alert state.... At this time, it is clear to me, based on the advice of my doctors, that I am in the terminal phase of this disease.... At the point at which I can no longer endure the pain and suffering associated with my cancer, I want to have drugs available for the purpose of hastening my death in a humane and certain manner. I want to be able to discuss freely with my treating physician my intention of hastening my death through the consumption of drugs prescribed for that purpose.
 
 
 19
 Mr. Kingsley subscribed to a declaration that included the following:
 
 
 20
 At this time I have almost no immune system function.... My first major illness associated with AIDS was cryptosporidiosis, a parasitic infection which caused me severe fevers and diarrhea and associated pain, suffering and exhaustion.... I also suffer from cytomegalovirus ("CMV") retinitis, an AIDS-related virus which attacks the retina and causes blindness. To date I have become almost completely blind in my left eye. I am at risk of losing my sight altogether from this condition.... I also suffer from toxoplasmosis, a parasitic infection which has caused lesions to develop on my brain.... I ... take daily infusions of cytovene for the ... retinitis condition. This medication, administered for an hour through a Hickman tube which is connected to an artery in my chest, prevents me from ever taking showers and makes simple routine functions burdensome. In addition, I inject my leg daily with neupogen to combat the deficient white cell count in my blood. The daily injection of this medication is extremely painful.... At this point it is clear to me, based on the advice of my doctors, that I am in the terminal phase of [AIDS].... It is my desire that my physician prescribe suitable drugs for me to consume for the purpose of hastening my death when and if my suffering becomes intolerable.
 
 In his declaration, Mr. Barth stated:
 
 21
 In May 1992, I developed a Kaposi's sarcoma skin lesion. This was my first major illness associated with AIDS. I underwent radiation and chemotherapy to treat this cancer.... In September 1993, I was diagnosed with cytomegalovirus ("CMV") in my stomach and colon which caused severe diarrhea, fevers and wasting.... In February 1994, I was diagnosed with microsporidiosis, a parasitic infection for which there is effectively no treatment.... At approximately the same time, I contracted AIDS-related pneumonia. The pneumonia's infusion therapy treatment was so extremely toxic that I vomited with each infusion.... In March 1994, I was diagnosed with cryptosporidiosis, a parasitic infection which has caused severe diarrhea, sometimes producing 20 stools a day, extreme abdominal pain, nausea and additional significant wasting. I have begun to lose bowel control.... For each of these conditions I have undergone a variety of medical treatments, each of which has had significant adverse side effects.... While I have tolerated some [nightly intravenous] feedings, I am unwilling to accept this for an extended period of time.... I understand that there are no cures.... I can no longer endure the pain and suffering ... and I want to have drugs available for the purpose of hastening my death.
 
 
 22
 A cross-motion for judgment on the pleadings was filed by Attorney General Koppell on October 11, 1994. Thereafter, on October 14, 1994, an amended complaint was filed by the three physicians and Mr. Kingsley naming as defendants Attorney General Koppell and New York State Governor Mario M. Cuomo. The counts of the complaint were the same as set forth in the original complaint, alleging violations of liberty interests guaranteed by the Fourteenth Amendment in Count I and violation of equal protection rights guaranteed by the Fourteenth Amendment in Count II. The prayer for relief remained the same as in the original complaint. Supplemental declarations in support of the plaintiff's motion for preliminary injunction also were filed on October 14, 1994. In their supplemental declarations, Doctors Klagsbrun and Grossman reiterated their desire "to prescribe drugs, if and when medically and psychiatrically appropriate, for such patients to self-administer at the time and place of their choice for the purpose of hastening their impending deaths."
 
 
 23
 In his supplemental declaration, Dr. Quill declared:
 
 
 24
 The removal of a life support system that directly results in the patient's death requires the direct involvement by the doctor, as well as other medical personnel. When such patients are mentally competent, they are consciously choosing death as preferable to life under the circumstances that they are forced to live. Their doctors do a careful clinical assessment, including a full exploration of the patient's prognosis, mental competence to make such decisions, and the treatment alternatives to stopping treatment. It is legally and ethically permitted for physicians to actively assist patients to die who are dependent on life-sustaining treatments.... Unfortunately, some dying patients who are in agony that can no longer be relieved, yet are not dependent on life-sustaining treatment, have no such options under current legal restrictions. It seems unfair, discriminatory, and inhumane to deprive some dying patients of such vital choices because of arbitrary elements of their condition which determine whether they are on life-sustaining treatment that can be stopped.
 
 
 25
 Along with the supplemental declarations filed on October 14th, an original declaration in support of the motion was filed by Dr. Jack Froom, a physician and Professor of Family Medicine with substantial experience in detecting depression in primary care patients. He declared:
 
 
 26
 Physicians can determine whether a patient's request to hasten death is rational and competent or motivated by depression or other mental illness or instability. Physicians currently make these determinations as to patient capacity to make end-of-life decisions with respect to orders not to resuscitate and refusal of life-sustaining treatment.... Terminally ill persons who seek to hasten death by consuming drugs need medical counseling regarding the type of drugs and the amount and manner in which they should be taken, as well as a prescription, which only a licensed medical doctor can provide.... Knowing what drug, in what amount, will hasten death for a particular patient, in light of the patient's medical condition and medication regimen, is a complex medical task.... It is not uncommon, in light of present legal constraints on physician assistance, that patients seeking to hasten their deaths try to do so without medical advice.... Very often, patients who survive a failed suicide attempt find themselves in worse condition than before the attempt. Brain damage, for example, is one result of failed suicide attempts.
 
 
 27
 A second amended complaint was filed on October 20, 1994. The parties, allegations and prayer for relief were the same as those contained in the first amended complaint, except that Robert M. Morgenthau, District Attorney of New York County, was added as a defendant in his official capacity. Both Dr. Grossman and Dr. Klagsbrun practice medicine in New York City, and Mr. Morgenthau is responsible for the prosecution of crimes occurring in New York County. The physician plaintiffs each filed second supplemental declarations on November 28, 1994, in support of the motion for a preliminary injunction. Each stated that he was currently treating mentally competent, terminally-ill patients who desired to hasten their deaths by self-administering drugs to be provided by the physicians "if and when medically and psychiatrically appropriate." These patients, according to the physicians, understood "their condition, diagnosis, and prognosis and wish[ed] to avoid prolonged suffering by hastening their deaths if and when their suffering [became] intolerable." None of the three terminally-ill plaintiffs named in the original complaint survived to the date of the district court's decision.
 
 
 28
 The opinion of the district court was filed on December 16, 1994. The district court denied the motion for a preliminary injunction and granted the defendants' cross motion to dismiss the action, treating the cross motion as one for summary judgment "since the court has considered matters outside the pleadings--i.e., declarations filed on the motion for preliminary injunction." Quill, 870 F.Supp. at 79. After finding that the action presented a justiciable case or controversy, the district court first addressed the due process issue. The court determined that physician assisted suicide could not be classified as a fundamental right within the meaning of the Constitution:
 
 
 29
 The Supreme Court has described the considerations which are appropriate before there can be a declaration that rights "not readily identifiable in the Constitution's text" are deserving of constitutional protection. Such rights must be implicit in the concept of ordered liberty so that neither liberty nor justice would exist if they were sacrificed. The Supreme Court has also characterized such rights as those liberties that are deeply rooted in the nation's history and traditions.
 
 
 30
 The trouble is that plaintiffs make no attempt to argue that physician assisted suicide, even in the case of terminally ill patients, has any historic recognition as a legal right.
 
 
 31
 Id. at 83 (internal citations omitted). Accordingly, the district court concluded "that the type of physician assisted suicide at issue in this case does not involve a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment." Id. at 84.
 
 
 32
 Turning to the equal protection issue, the district court identified a reasonable and rational basis for the distinction drawn by New York law between the refusal of treatment at the hands of physicians and physician assisted suicide:
 
 
 33
 [I]t is hardly unreasonable or irrational for the State to recognize a difference between allowing nature to take its course, even in the most severe situations, and intentionally using an artificial death-producing device. The State has obvious legitimate interests in preserving life, and in protecting vulnerable persons. The State has the further right to determine how these crucial interests are to be treated when the issue is posed as to whether a physician can assist a patient in committing suicide.
 
 
 34
 Id. at 84-85. Accordingly, the court held "that plaintiffs have not shown a violation of the Equal Protection Clause of the Fourteenth Amendment." Id. at 85.
 
 DISCUSSION
 I. Justiciability
 
 35
 As they did in the district court, the state defendants contend on appeal that this action does not present a justiciable case or controversy. We reject this contention.
 
 
 36
 In Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), the Supreme Court was faced with a constitutional challenge to an Arizona farm labor statute. The Court stated that, when contesting the constitutionality of a state criminal statute, it is not necessary that the plaintiff first expose himself to actual prosecution. Id. at 298, 99 S.Ct. at 2308-09. Rather,
 
 
 37
 [w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."
 
 
 38
 Id. (quoting Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973)). The Court in Doe held that plaintiff physicians had presented a justiciable controversy despite the fact that none had been threatened with prosecution. 410 U.S. at 188, 93 S.Ct. at 745-46. The law that the physicians challenged was a criminal statute that directly criminalized the physician's participation in abortion. Accordingly, a sufficiently concrete controversy was presented.
 
 
 39
 The same principles lead to the conclusion that there is a case or controversy at issue here. Dr. Quill has had a criminal proceeding instituted against him in the past, and the state nowhere disclaims an intent to repeat a prosecution in the event of further assisted suicides. The other two physician plaintiffs also face the threat of criminal prosecution. Like the physicians in Doe, they "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." Finally, under Doe, the physicians may raise the rights of their terminally-ill patients. See id.
 
 
 40
 Although District Attorney Morgenthau argues in his brief on appeal that appellants have not shown that they are in any jeopardy of prosecution in New York County, a recent indictment by a New York County grand jury demonstrates the contrary. A newspaper report printed on December 15, 1995 disclosed the following:
 
 
 41
 Yesterday, District Attorney Robert M. Morgenthau of Manhattan announced that a grand jury had indicted [George] Delury, an editor who lives on the Upper West Side, on manslaughter charges for helping his 52-year-old wife, Myrna Lebov, commit suicide last summer.
 
 
 42
 Carey Goldberg, Suicide's Husband Is Indicted; Diary Records Pain of 2 Lives, N.Y. Times, Dec. 15, 1995, at B1.[1] The physician plaintiffs have good reason to fear prosecution in New York County.
 
 II. Substantive Due Process
 
 43
 Plaintiffs argue for a right to assisted suicide as a fundamental liberty under the substantive component of the Due Process Clause of the Fourteenth Amendment. This Clause assures the citizenry that any deprivation of life, liberty or property by a state will be attended by appropriate legal processes. However,
 
 
 44
 despite the language of the Due Process Clause[ ] of the ... Fourteenth Amendment[ ], which appears to focus only on the processes by which life, liberty, or property is taken, the cases are legion in which th[at] Clause[ ] ha[s] been interpreted to have substantive content, subsuming rights that to a great extent are immune from ... state regulation or proscription. Among such cases are those recognizing rights that have little or no textual support in the constitutional language.
 
 
 45
 Bowers v. Hardwick, 478 U.S. 186, 191, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986).
 
 
 46
 Rights that have no textual support in the language of the Constitution but qualify for heightened judicial protection include fundamental liberties so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed." Palko v. Connecticut, 302 U.S. 319, 325-26, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). Fundamental liberties also have been described as those that are "deeply rooted in this Nation's history and tradition." Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977); see also Griswold v. Connecticut, 381 U.S. 479, 506, 85 S.Ct. 1678, 1693-94, 14 L.Ed.2d 510 (1965) (White, J., concurring). It is well settled that the state must not infringe fundamental liberty interests unless the infringement is narrowly tailored to serve a compelling state interest. Reno v. Flores, 507 U.S. 292, 301-03, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993). The list of rights the Supreme Court has actually or impliedly identified as fundamental, and therefore qualified for heightened judicial protection, include the fundamental guarantees of the Bill of Rights as well as the following: freedom of association; the right to participate in the electoral process and to vote; the right to travel interstate; the right to fairness in the criminal process; the right to procedural fairness in regard to claims for governmental deprivations of life, liberty or property; and the right to privacy. 2 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 15.7, at 434-36 (2d ed.1992). The right of privacy has been held to encompass personal decisions relating to marriage, procreation, family relationships, child rearing and education, contraception and abortion. See Carey v. Population Servs. Int'l, 431 U.S. 678, 684-85, 97 S.Ct. 2010, 2015-16, 52 L.Ed.2d 675 (1977). While the Constitution does not, of course, include any explicit mention of the right of privacy, this right has been recognized as encompassed by the Fourteenth Amendment's Due Process Clause. Id. at 684, 97 S.Ct. at 2015-16. Nevertheless, the Supreme Court has been reluctant to further expand this particular list of federal rights, and it would be most speculative for a lower court to do so. See Rotunda & Nowak, Treatise on Constitutional Law, supra, § 15.7, at 433-37.
 
 
 47
 In any event, the Supreme Court has drawn a line, albeit a shaky one, on the expansion of fundamental rights that are without support in the text of the Constitution. In Bowers, the Supreme Court framed the issue as "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy and hence invalidates the laws of the many States that still make such conduct illegal and have done so for a very long time." 478 U.S. at 190, 106 S.Ct. at 2843. Holding that there was no fundamental right to engage in consensual sodomy, the Court noted that the statutes proscribing such conduct had "ancient roots." Id. at 192, 106 S.Ct. at 2844-45. The Court noted that sodomy was a common law criminal offense, forbidden by the laws of the original 13 states when they ratified the Bill of Rights, and that 25 states and the District of Columbia still penalize sodomy performed in private by consenting adults. Id. at 192-93, 106 S.Ct. at 2844-46.
 
 
 48
 As in Bowers, the statutes plaintiffs seek to declare unconstitutional here cannot be said to infringe upon any fundamental right or liberty. As in Bowers, the right contended for here cannot be considered so implicit in our understanding of ordered liberty that neither justice nor liberty would exist if it were sacrificed. Nor can it be said that the right to assisted suicide claimed by plaintiffs is deeply rooted in the nation's traditions and history. Indeed, the very opposite is true. The Common Law of England, as received by the American colonies, prohibited suicide and attempted suicide. See Thomas J. Marzen et al., Suicide: A Constitutional Right?, 24 Duq. L.Rev. 1, 56-67 (1985). Although neither suicide nor attempted suicide is any longer a crime in the United States, 32 states, including New York, continue to make assisted suicide an offense. The New York State Task Force on Life and the Law, When Death Is Sought: Assisted Suicide and Euthanasia in the Medical Context, 55 (1994) ("When Death Is Sought "). Clearly, no "right" to assisted suicide ever has been recognized in any state in the United States. See generally Mark E. Chopko & Michael F. Moses, Assisted Suicide: Still a Wonderful Life?, 70 Notre Dame L.Rev. 519, 561 (1995); Yale Kamisar, Are Laws against Assisted Suicide Unconstitutional?, 23 Hastings Center Rep., May-June 1993, at 32.
 
 
 49
 In rejecting the due process-fundamental rights argument of the plaintiffs, we are mindful of the admonition of the Supreme Court:
 
 
 50
 Nor are we inclined to take a more expansive view of our authority to discover new fundamental rights imbedded in the Due Process Clause. The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution.
 
 
 51
 Bowers, 478 U.S. at 194, 106 S.Ct. at 2846. The right to assisted suicide finds no cognizable basis in the Constitution's language or design, even in the very limited cases of those competent persons who, in the final stages of terminal illness, seek the right to hasten death. We therefore decline the plaintiffs' invitation to identify a new fundamental right, in the absence of a clear direction from the Court whose precedents we are bound to follow. The limited room for expansion of substantive due process rights and the reasons therefor have been clearly stated: "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). Our position in the judicial hierarchy constrains us to be even more reluctant than the Court to undertake an expansive approach in this unchartered area.
 
 III. Equal Protection
 
 52
 According to the Fourteenth Amendment, the equal protection of the laws cannot be denied by any State to any person within its jurisdiction. U.S. Const. amend. XIV, § 1. This constitutional guarantee simply requires the states to treat in a similar manner all individuals who are similarly situated. See 3 Rotunda & Nowak, Treatise on Constitutional Law, supra, § 18.2, at 7. But disparate treatment is not necessarily a denial of the equal protection guaranteed by the Constitution. The Supreme Court has described the wide discretion afforded to the states in establishing acceptable classifications:
 
 
 53
 The Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike." But so too, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." The initial discretion to determine what is "different" and what is "the same" resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.
 
 
 54
 Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (internal citations omitted and alteration in original).
 
 
 55
 The general rule, then, is that state legislation carries a presumption of validity if the statutory classification is "rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). In Cleburne, the equal protection issue revolved around a zoning ordinance that required a special use permit for homes for the mentally retarded but not for other multiple-dwelling and care-giving facilities. The Supreme Court resolved the issue as follows:
 
 
 56
 Because in our view the record does not reveal any rational basis for believing that the Featherston home [for the mentally retarded] would pose any special threat to the city's legitimate interests, we affirm the judgment below insofar as it holds the ordinance invalid as applied in this case.
 
 
 57
 Id. at 448, 105 S.Ct. at 3258. In arriving at this conclusion, the Court rejected the city's claims that the disparate classification was justified by the negative attitudes of property owners in the neighborhood of the proposed facility, the location of the facility across the street from a junior high school and on a 500-year flood plain, concerns about legal responsibility for actions that might be taken by the mentally retarded, or concerns about the size of the facility and the number of occupants. Id. at 448-50, 105 S.Ct. at 3258-60. The Court carefully examined each of these claims before finding that there was no acceptable reason for the disparate classification in any of them.
 
 
 58
 Also found invalid under the Equal Protection Clause for failure to survive rational basis scrutiny was a New Mexico statute providing a partial exemption from the state's property tax for certain honorably discharged veterans. Hooper v. Bernalillo County Assessor, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985). The exemption was limited to veterans who had served on active duty during the Vietnam War for at least 90 continuous days and were New Mexico residents before May 8, 1976. In finding the residence requirement invalid under the Equal Protection Clause, the Court analyzed the New Mexico statute in light of the following principles: "When a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment. Generally, a law will survive that scrutiny if the distinction rationally furthers a legitimate state purpose." Id. at 618, 105 S.Ct. at 2866 (footnote omitted). The Court determined that the distinction made between veterans who arrived in the state prior to May 8, 1976 and those who arrived thereafter bore no rational relationship to the state's declared objectives of encouraging veterans to settle in the state and of rewarding citizens who resided in the state prior to the cut-off date for their military service. Id. at 619-20, 105 S.Ct. at 2866-67.
 
 
 59
 As to the first objective, the Court wrote:
 
 
 60
 The distinction New Mexico makes between veterans who established residence before May 8, 1976, and those veterans who arrived in the State thereafter bears no rational relationship to one of the State's objectives--encouraging Vietnam veterans to move to New Mexico. The legislature set this eligibility date long after the triggering event occurred. The legislature cannot plausibly encourage veterans to move to the State by passing such retroactive legislation.
 
 
 61
 Id. at 619, 105 S.Ct. at 2866-67 (internal citation omitted). As to the second declared objective, the Court noted that a state court may legitimately compensate resident veterans for past services by providing various advantages, but that "the New Mexico statute's distinction between resident veterans is not rationally related to the State's asserted legislative goal." Id. at 621-22, 105 S.Ct. at 2868. The Court held:
 
 
 62
 The State may not favor established residents over new residents based on the view that the State may take care of "its own," if such is defined by prior residence. Newcomers, by establishing bona fide residence in the State, become the State's "own" and may not be discriminated against solely on the basis of their arrival in the State after May 8, 1976.
 
 
 63
 Id. at 623, 105 S.Ct. at 2868; see also Zobel v. Williams, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (holding that Alaska statute using length of residence as basis for distribution of oil reserve dividends violated Equal Protection Clause.)
 
 
 64
 While rational basis scrutiny governs judicial review of the constitutionality of legislation in the areas of social welfare and economics, see Bowen v. Owens, 476 U.S. 340, 345, 106 S.Ct. 1881, 1885, 90 L.Ed.2d 316 (1986), strict scrutiny is the standard of review where a classification "impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class," Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (footnotes omitted). Suspect classes are those identified by race, alienage or national origin, Cleburne, 473 U.S. at 440, 105 S.Ct. at 3254-55, and fundamental rights are those explicitly or implicitly derived from the Constitution itself, see San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 33-34, 93 S.Ct. 1278, 1296-97, 36 L.Ed.2d 16 (1973). For the reasons described in Part II, supra, the New York statutes prohibiting assisted suicide during the terminal stages of illness do not impinge on any fundamental rights nor can it be said that they involve suspect classifications. Laws subject to strict scrutiny will survive such review only if they are suitably tailored to serve a compelling state interest. Cleburne, 473 U.S. at 440, 105 S.Ct. at 3254-55.
 
 
 65
 An intermediate level of scrutiny has been applied in analyzing certain equal protection guarantee violations. To pass this scrutiny, the classification must be substantially related to an important governmental objective. Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988). This sort of examination has been applied to classifications based on sex or illegitimacy. Id.; see also Kadrmas v. Dickinson Pub. Sch., 487 U.S. 450, 459, 108 S.Ct. 2481, 2488, 101 L.Ed.2d 399 (1988); Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 723-24, 102 S.Ct. 3331, 3335-36, 73 L.Ed.2d 1090 (1982). A heightened level of equal protection scrutiny also was applied in Plyler, where the Supreme Court struck down a Texas statute withholding from local school districts funding for the education of children not legally admitted into the United States. 457 U.S. at 202, 102 S.Ct. at 2387.
 
 
 66
 Applying the foregoing principles to the New York statutes criminalizing assisted suicide, it seems clear that: 1) the statutes in question fall within the category of social welfare legislation and therefore are subject to rational basis scrutiny upon judicial review; 2) New York law does not treat equally all competent persons who are in the final stages of fatal illness and wish to hasten their deaths; 3) the distinctions made by New York law with regard to such persons do not further any legitimate state purpose; and 4) accordingly, to the extent that the statutes in question prohibit persons in the final stages of terminal illness from having assistance in ending their lives by the use of self-administered, prescribed drugs, the statutes lack any rational basis and are violative of the Equal Protection Clause.
 
 
 67
 The right to refuse medical treatment long has been recognized in New York. In 1914 Judge Cardozo wrote that, under New York law, "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body." Schloendorff v. Society of New York Hosp., 211 N.Y. 125, 129, 105 N.E. 92 (1914). In 1981, the New York Court of Appeals held that this right extended to the withdrawal of life-support systems. In re Eichner (decided with In re Storar ), 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64, cert. denied, 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981). The Eichner case involved a terminally-ill, 83-year-old patient whose guardian ultimately was authorized to withdraw the patient's respirator. The Court of Appeals determined that the guardian had proved by clear and convincing evidence that the patient, prior to becoming incompetent due to illness, had consistently expressed his view that life should not be prolonged if there was no hope of recovery. Id. at 379-80, 438 N.Y.S.2d 266, 420 N.E.2d 64. In Storar, the companion case to Eichner, the Court of Appeals determined that a profoundly retarded, terminally-ill patient was incapable of making a decision to terminate blood transfusions. There, the patient was incapable of making a reasoned decision, having never been competent at any time in his life. Id. at 380, 438 N.Y.S.2d 266, 420 N.E.2d 64. In both these cases, the New York Court of Appeals recognized the right of a competent, terminally-ill patient to hasten his death upon proper proof of his desire to do so.
 
 
 68
 The Court of Appeals revisited the issue in Rivers v. Katz, 67 N.Y.2d 485, 504 N.Y.S.2d 74, 495 N.E.2d 337 (1986) (establishing the right of mentally incompetent persons to refuse certain drugs). In that case, the Court recognized the right to bring on death by refusing medical treatment not only as a "fundamental common-law right" but also as "coextensive with [a] patient's liberty interest protected by the due process clause of our State Constitution." Id. at 493, 504 N.Y.S.2d 74, 495 N.E.2d 337. The following language was included in the opinion:
 
 
 69
 In our system of a free government, where notions of individual autonomy and free choice are cherished, it is the individual who must have the final say in respect to decisions regarding his medical treatment in order to insure that the greatest possible protection is accorded his autonomy and freedom from unwanted interference with the furtherance of his own desires.
 
 
 70
 Id.
 
 
 71
 After these cases were decided, the New York legislature placed its imprimatur upon the right of competent citizens to hasten death by refusing medical treatment and by directing physicians to remove life-support systems already in place. In 1987, the legislature enacted Article 29-B of the New York Public Health Law, entitled "Orders Not to Resuscitate." N.Y. Pub. Health Law §§ 2960-79 (McKinney 1993). The Article provides that an "adult with capacity" may direct the issuance of an order not to resuscitate. § 2964. "Order not to resuscitate" is defined as "an order not to attempt cardiopulmonary resuscitation in the event a patient suffers cardiac or respiratory arrest." *728s 2961(17). "Cardiopulmonary resuscitation" is defined as "measures ... to restore cardiac function or to support ventilation in the event of a cardiac or respiratory arrest." § 2961(4). An elaborate statutory scheme is in place, and it provides, among other things, for surrogate decision-making, § 2965, revocation of consent, § 2969, physician review, § 2970, dispute mediation, § 2972, and judicial review, § 2973.
 
 
 72
 In 1990, the New York legislature enacted Article 29-C of the Public Health Law, entitled "Health Care Agents and Proxies." N.Y. Pub. Health Law §§ 2980-94 (McKinney 1993). This statute allows for a person to sign a health care proxy, § 2981, for the purpose of appointing an agent with "authority to make any and all health care decisions on the principal's behalf that the principal could make." § 2982(1). These decisions include those relating to the administration of artificial nutrition and hydration, provided the wishes of the principal are known to the agent. § 2982(2). The agent's decision is made "[a]fter consultation with a licensed physician, registered nurse, licensed clinical psychologist or certified social worker." Id. Accordingly, a patient has the right to hasten death by empowering an agent to require a physician to withdraw life-support systems. The proxy statute also presents a detailed scheme, with provisions for a determination that the principal lacks capacity to make health care decisions, for such a determination to be made only by the attending physician in consultation with another physician "[f]or a decision to withdraw or withhold life-sustaining treatment," § 2983, for provider's obligations, § 2984, for revocation, § 2985, and for special proceedings, § 2992, among other matters.
 
 
 73
 The concept that a competent person may order the removal of life-support systems found Supreme Court approval in Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). There the Court upheld a determination of the Missouri Supreme Court that required proof by clear and convincing evidence of a patient's desire for the withdrawal of life-sustaining equipment. The patient in that case, Nancy Cruzan, was in a persistent vegetative state as the result of injuries sustained in an automobile accident. Her parents sought court approval in the State of Missouri to terminate the artificial nutrition and hydration with which she was supplied at the state hospital where she was confined. The hospital employees refused to withdraw the life-support systems, without which Cruzan would suffer certain death. The trial court authorized the withdrawal after finding that Cruzan had expressed some years before to a housemate friend some thoughts that suggested she would not wish to live on a life-support system. The trial court also found that one in Cruzan's condition had a fundamental right to refuse death-prolonging procedures.
 
 
 74
 The Missouri Supreme Court, in reversing the trial court, refused to find a broad right of privacy in the state constitution that would support a right to refuse treatment. Moreover, that court doubted that such a right existed under the United States Constitution. It did identify a state policy in the Missouri Living Will Statute favoring the preservation of life and concluded that, in the absence of compliance with the statute's formalities or clear and convincing evidence of the patient's choice, no person could order the withdrawal of medical life-support services.
 
 
 75
 In affirming the Missouri Supreme Court, the United States Supreme Court stated: "The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions." Id. at 278, 110 S.Ct. at 2851. The Court noted that the inquiry is not ended by the identification of a liberty interest, because there also must be a balancing of the state interests and the individual's liberty interests before there can be a determination that constitutional rights have been violated. Id. at 279, 110 S.Ct. at 2851-52. The Court all but made that determination in the course of the following analysis:
 
 
 76
 Petitioners insist that under the general holdings of our cases, the forced administration of life-sustaining medical treatment, and even of artificially-delivered food and water essential to life, would implicate a competent person's liberty interest. Although we think the logic of the cases discussed above would embrace such a liberty interest, the dramatic consequences involved in refusal of such treatment would inform the inquiry as to whether the deprivation of that interest is constitutionally permissible. But for purposes of this case, we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition.
 
 
 77
 Id.
 
 
 78
 The Court went on to find that Missouri allowed a surrogate to "act for the patient in electing to have hydration and nutrition withdrawn in such a way as to cause death," subject to "a procedural safeguard to assure that the action of the surrogate conforms as best it may to the wishes expressed by the patient while competent." Id. at 280, 110 S.Ct. at 2852. The Court then held that the procedural safeguard or requirement imposed by Missouri--the heightened evidentiary requirement that the incompetent's wishes be proved by clear and convincing evidence--was not forbidden by the United States Constitution. Id. at 280-82, 110 S.Ct. at 2852-53.
 
 
 79
 In view of the foregoing, it seems clear that New York does not treat similarly circumstanced persons alike: those in the final stages of terminal illness who are on life-support systems are allowed to hasten their deaths by directing the removal of such systems; but those who are similarly situated, except for the previous attachment of life-sustaining equipment, are not allowed to hasten death by self-administering prescribed drugs. The district judge has identified "a difference between allowing nature to take its course, even in the most severe situations, and intentionally using an artificial death-producing device." Quill, 870 F.Supp. at 84. But Justice Scalia, for one, has remarked upon "the irrelevance of the action-inaction distinction," noting that "the cause of death in both cases is the suicide's conscious decision to 'pu[t] an end to his own existence.' " Cruzan, 497 U.S. at 296-297, 110 S.Ct. at 2861 (citations omitted and alteration in original) (Scalia, J., concurring); see also Note, Physician-Assisted Suicide and the Right to Die with Assistance, 105 Harv. L.Rev. 2021, 2028-31 (1992) (arguing that there is no distinction between assisted suicide and the withholding or withdrawal of treatment).
 
 
 80
 Indeed, there is nothing "natural" about causing death by means other than the original illness or its complications. The withdrawal of nutrition brings on death by starvation, the withdrawal of hydration brings on death by dehydration, and the withdrawal of ventilation brings about respiratory failure. By ordering the discontinuance of these artificial life-sustaining processes or refusing to accept them in the first place, a patient hastens his death by means that are not natural in any sense. It certainly cannot be said that the death that immediately ensues is the natural result of the progression of the disease or condition from which the patient suffers.
 
 
 81
 Moreover, the writing of a prescription to hasten death, after consultation with a patient, involves a far less active role for the physician than is required in bringing about death through asphyxiation, starvation and/or dehydration. Withdrawal of life support requires physicians or those acting at their direction physically to remove equipment and, often, to administer palliative drugs which may themselves contribute to death. The ending of life by these means is nothing more nor less than assisted suicide. It simply cannot be said that those mentally competent, terminally-ill persons who seek to hasten death but whose treatment does not include life support are treated equally.
 
 
 82
 A finding of unequal treatment does not, of course, end the inquiry, unless it is determined that the inequality is not rationally related to some legitimate state interest. The burden is upon the plaintiffs to demonstrate irrationality. See Kadrmas, 487 U.S. at 463, 108 S.Ct. at 2490. At oral argument and in its brief, the state's contention has been that its principal interest is in preserving the life of all its citizens at all times and under all conditions. But what interest can the state possibly have in requiring the prolongation of a life that is all but ended? Surely, the state's interest lessens as the potential for life diminishes. See In re Quinlan, 0 N.J. 10, 41, 355 A.2d 647, cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). And what business is it of the state to require the continuation of agony when the result is imminent and inevitable? What concern prompts the state to interfere with a mentally competent patient's "right to define [his] own concept of existence, of meaning, of the universe, and of the mystery of human life," Planned Parenthood v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992), when the patient seeks to have drugs prescribed to end life during the final stages of a terminal illness? The greatly reduced interest of the state in preserving life compels the answer to these questions: "None."
 
 
 83
 A panel of the Ninth Circuit attempted to identify some state interests in reversing a district court decision holding unconstitutional a statute of the state of Washington criminalizing the promotion of a suicide attempt. Compassion in Dying v. Washington, 49 F.3d 586 (9th Cir.1995).[2] The plaintiffs in the Washington case contended for physician-assisted suicide for the terminally-ill, but the panel majority found that the statute prohibiting suicide promotion furthered the following: the interest in denying to physicians "the role of killers of their patients"; the interest in avoiding psychological pressure upon the elderly and infirm to consent to death; the interest of preventing the exploitation of the poor and minorities; the interest in protecting handicapped persons against societal indifference; the interest in preventing the sort of abuse that "has occurred in the Netherlands where ... legal guidelines have tacitly allowed assisted suicide or euthanasia in response to a repeated request from a suffering, competent patient." Id. at 592-93. The panel majority also raised a question relative to the lack of clear definition of the term "terminally ill." Id. at 593.
 
 
 84
 The New York statutes prohibiting assisted suicide, which are similar to the Washington statute, do not serve any of the state interests noted, in view of the statutory and common law schemes allowing suicide through the withdrawal of life-sustaining treatment. Physicians do not fulfill the role of "killer" by prescribing drugs to hasten death any more than they do by disconnecting life-support systems. Likewise, "psychological pressure" can be applied just as much upon the elderly and infirm to consent to withdrawal of life-sustaining equipment as to take drugs to hasten death. There is no clear indication that there has been any problem in regard to the former, and there should be none as to the latter. In any event, the state of New York may establish rules and procedures to assure that all choices are free of such pressures. With respect to the protection of minorities, the poor and the non-mentally handicapped, it suffices to say that these classes of persons are entitled to treatment equal to that afforded to all those who now may hasten death by means of life-support withdrawal. In point of fact, these persons themselves are entitled to hasten death by requesting such withdrawal and should be free to do so by requesting appropriate medication to terminate life during the final stages of terminal illness.
 
 
 85
 As to the interest in avoiding abuse similar to that occurring in the Netherlands, it seems clear that some physicians there practice nonvoluntary euthanasia, although it is not legal to do so. When Death Is Sought, supra, at 133-34. The plaintiffs here do not argue for euthanasia[3] at all but for assisted suicide for terminally-ill, mentally competent patients, who would self-administer the lethal drugs. It is difficult to see how the relief the plaintiffs seek would lead to the abuses found in the Netherlands. Moreover, note should be taken of the fact that the Royal Dutch Medical Association recently adopted new guidelines for those physicians who choose to accede to the wishes of patients to hasten death. Under the new guidelines, patients must self-administer drugs whenever possible, and physicians must obtain a second opinion from another physician who has no relationship with the requesting physician or his patient. Marlise Simons, Dutch Doctors to Tighten Rules on Mercy Killings, N.Y. Times, Sept. 11, 1995, at A3.
 
 
 86
 Finally, it seems clear that most physicians would agree on the definition of "terminally ill," at least for the purpose of the relief that plaintiffs seek. The plaintiffs seek to hasten death only where a patient is in the "final stages" of "terminal illness," and it seems even more certain that physicians would agree on when this condition occurs. Physicians are accustomed to advising patients and their families in this regard and frequently do so when decisions are to be made regarding the furnishing or withdrawal of life-support systems. Again, New York may define that stage of illness with greater particularity, require the opinion of more than one physician or impose any other obligation upon patients and physicians who collaborate in hastening death.[4]
 
 
 87
 The New York statutes criminalizing assisted suicide violate the Equal Protection Clause because, to the extent that they prohibit a physician from prescribing medications to be self-administered by a mentally competent, terminally-ill person in the final stages of his terminal illness, they are not rationally related to any legitimate state interest.
 
 CONCLUSION
 
 88
 We reverse the judgment of the district court and remand for entry of judgment in favor of the plaintiffs in accordance with the foregoing. No costs are awarded to either side. See Fed.R.App.P. 39(a).
 
 
 89
 CALABRESI, Circuit Judge, concurring in the result.
 
 
 90
 The Court today strikes down the New York statutes prohibiting assisted suicide insofar as they apply to "terminally ill, mentally competent patients, who would self-administer drugs." It does so because it finds these statutes to be in violation of the Equal Protection Clause of the Fourteenth Amendment since they are not "rationally related to a legitimate state interest." Ante at 725 (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254-55, 87 L.Ed.2d 313 (1985)). At the same time, the Court declines to hold that these statutes violate the Due Process Clause of the Fourteenth Amendment, because "[t]he right to assisted suicide finds no cognizable basis in the Constitution's language or design." Ante at 724.
 
 
 91
 Recently the Ninth Circuit, sitting en banc, held that analogous laws violated the fundamental Due Process rights of terminally ill patients. Compassion in Dying v. Washington, 79 F.3d 790 (9th Cir.1996) (en banc ). The Ninth Circuit recognized that Equal Protection arguments for invalidity were "not insubstantial," but did not discuss them in view of its Due Process holding. Id. at 838 n. 139.
 
 
 92
 I agree with the Court that these statutes cannot stand. But I do not believe that the history of the statutes, and of New York's approach toward assisted suicide, requires us to make a final judgment under either Due Process or Equal Protection as to the validity of statutes prohibiting assisted suicide. What is not ready for decision ought not to be decided. I would therefore leave open the question of whether, if the state of New York were to enact new laws prohibiting assisted suicide (laws that either are less absolute in their application or are identical to those before us), such laws would stand or fall.
 
 
 93
 Accordingly, I join the Court's result, but write separately to explain my unwillingness to reach the ultimate Due Process and Equal Protection questions.
 
 I. A Bit of History
 
 94
 There once was a time when the law and its judges were not called upon to make choices for human beings lying in the twilight between life and death. In the past, many of these decisions were left to individual doctors and their patients. Sometimes, easing of pain melded, not quite imperceptibly, into more. While doctors did not advertise their availability, there often was an understanding (perhaps unspoken), as patients entered into what usually were long-term relationships with physicians, that when the time came doctors would do what was expected of them. Laws prohibiting assisted suicide were on the books. But whether they were ever meant to apply to a treating physician, or whether such doctors were even slightly concerned about them, is unclear and lost in the shadows of time.[1] And despite a web of statutes, and doctors who, understandably, have become increasingly averse to taking risks and responsibilities, that tradition undoubtedly continues today. As the majority demonstrates, however, this fact is not a prescription for judicial silence. Ante at 722-23. We must, therefore, address petitioners' claim that New York's laws are invalid.
 
 
 95
 The statutes at issue were born in another age. New York enacted its first prohibition of assisted suicide in 1828. The statute punished any individual who assisted another in committing "self-murder" for first-degree manslaughter. Act of Dec. 10, 1828, ch. 20, 4 1828 N.Y. Laws 19 (codified at N.Y.Rev.Stat. pt. 4, ch. 1, tit. 2, art. 1, § 7 (1829)). This prohibition was tied to the crime of suicide, described by one contemporary New York Court as a "criminal act of self-destruction." Breasted v. Farmers' Loan & Trust Co., 4 Hill 73, 75 (Sup.Ct.1843), aff'd, 8 N.Y. 299 (1853).
 
 
 96
 English authorities had long declared suicide to be murder. See 3 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND 54 (London, E. & R. Brooke 1797) (1644); 1 MATTHEW HALE, PLEAS OF THE CROWN 411-18 (London, E. & R. Nutt 1736) (1680); 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND * 189 (1769); 3 JAMES FITZJAMES STEPHEN, HISTORY OF THE CRIMINAL LAW OF ENGLAND 104 (1869); William E. Mikell, Is Suicide Murder?, 3 COLUM. L. REV . 379, 391 (1903) ("[W]hatever may have been the law before Bracton's time ... suicide is murder in English law."). And the leading American case echoed these English authorities. See Commonwealth v. Bowen, 13 Mass. 356 (1816). In that case, Chief Justice Parker instructed the jury: "Self-destruction is doubtless a crime of awful turpitude; it is considered in the eye of the law of equal heinousness with the murder of one by another. In this offence, it is true the actual murderer escapes punishment; for the very commission of the crime, which the the [sic] law would otherwise punish with its utmost rigor, puts the offender beyond the reach of its infliction. And in this he is distinguished from other murderers. But his punishment is as severe as the nature of the case will admit; his body is buried in infamy, and in England his property is forfeited to the King." Commonwealth v. Mink, 123 Mass. 422, 428 (1877) (reprinting Parker's jury instructions in Bowen ). Mink itself, written by Chief Justice Gray, found that "any attempt to commit" suicide is "unlawful and criminal." Id. at 429.
 
 
 97
 Four years after Mink, however, the New York Legislature revised the Penal Code. The new code provided that an intentional attempt to commit suicide was a felony with a maximum penalty of two years' imprisonment. Act of July 26, 1881, ch. 676, §§ 174, 178, 3 1881 N.Y. Laws 42-43. But while the Code declared suicide itself to be "a grave public wrong," it imposed no forfeiture because of "the impossibility of reaching the successful perpetrator." Id. § 173. The 1881 statute, echoing the earlier 1828 provision, punished assisting a successful suicide as manslaughter in the first degree. Id. § 175. The Code also punished assistance in attempted suicide as an unspecified felony. Id. § 176.
 
 
 98
 Whatever may have been the case in other jurisdictions,[2] the 1828 and 1881 statutes prohibited all attempts to assist in a suicide on the theory that such behavior created accessory liability. Thus, because attempted suicide was a crime, assisting in the commission of suicide was also a crime. And the titles of the sections of the 1881 statute manifest these derivative origins; section 175 prohibited "Aiding suicide" and section 176 prohibited "Abetting an attempt at suicide." Id. (emphasis added).[3] Whether these laws applied to a doctor who eased or hastened the death of a terminally ill patient is, of course, quite another matter, and one on which the evidence is scant.[4]
 
 
 99
 The 1881 scheme was altered in 1919 when the prohibition against attempted suicide (originally found in sections 174 and 178) was removed. Act of May 5, 1919, ch. 414, § 1, 2 1919 N.Y. Laws 1193. The Legislature, nevertheless, left in place the declaration of suicide as a "grave public wrong." See Hundert v. Commercial Travelers' Mut. Accident Ass'n of Am., 244 A.D. 459, 460, 279 N.Y.S. 555, 556 (1st Dep't 1935) (per curiam) ("[S]uicide, although recognized as a grave public wrong, is not a crime."). And the prohibition of assisting suicide also remained on the books. But we have found no case in which a physician aiding a person who wished to commit suicide was, in fact, penalized in New York after 1919.
 
 
 100
 In 1965, the Legislature took the next step and deleted the declaration that suicide was a "grave public wrong."[5] It, however, left in place redrafted versions of sections 175 and 176 of the 1881 Code, stating: "A person is guilty of manslaughter in the second degree when ... [h]e intentionally causes or aids another person to commit suicide," § 125.15(3), and, "[a] person is guilty of promoting a suicide attempt when he intentionally causes or aids another person to attempt suicide," § 120.30.[6]
 
 
 101
 The years since 1965 have brought further erosion in the bases for prohibiting assisted suicide with respect to terminally ill persons. Thus, in 1981, the New York Court of Appeals declared that "a doctor cannot be held to have violated his legal or professional responsibilities when he honors the right of a competent adult patient to decline medical treatment." In re Storar, 52 N.Y.2d 363, 377, 420 N.E.2d 64, 71, 438 N.Y.S.2d 266, 273, cert. denied, 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981). The court applied this principle both to the withdrawal of life-support and to the refusal of blood transfusions. Id. at 379-80, 438 N.Y.S.2d 266, 420 N.E.2d 64. Furthermore, in 1986, the court stated: "In our system of a free government, where notions of individual autonomy and free choice are cherished, it is the individual who must have the final say in respect to decisions regarding his medical treatment...." Rivers v. Katz, 67 N.Y.2d 485, 493, 495 N.E.2d 337, 341, 504 N.Y.S.2d 74, 78 (1986). Lower courts, understandably, followed suit. See Delio v. Westchester County Medical Ctr., 129 A.D.2d 1, 516 N.Y.S.2d 677 (2d Dep't 1987) ("[T]he common-law right of self determination with respect to one's body also forms the foundation for a competent adult patient's right to refuse life-sustaining treatment even if the effect is to hasten death....").
 
 
 102
 The New York Legislature itself acted accordingly. In the 1987 Orders Not to Resuscitate Act, it provided that an "adult with capacity" may create an "order not to resuscitate" in the event the patient "suffers cardiac or respiratory arrest." Act of Aug. 7, 1987, ch. 818, § 1, 1987 N.Y. Laws 3140 (codified as amended at N.Y. Pub. Health Law, §§ 2960-2979 (McKinney 1993 & Supp.1996)). In the 1990 Health Care Agents and Proxies Act, it went further and permitted a competent person to designate an agent who has "authority to make any and all health care decisions on the principal's behalf that the principal could make." Act of July 22, 1990, ch. 752, § 2, 1990 N.Y. Laws 1538 (codified as amended at N.Y. Pub. Health Law § 2982(1) (McKinney 1993)). The statute explicitly stated that choices regarding the withdrawal of artificial nutrition and hydration are within the purview of a health care agent when the wishes of the principal are reasonably known to the agent. N.Y. Pub. Health Law § 2982(2).[7]
 
 
 103
 Later, in 1994, the New York Task Force on Life and the Law, a group organized in 1985 at the request of Governor Cuomo and composed of doctors, bioethicists, and religious leaders, among others, prepared a report on the question. The report, in effect, said leave things as they are: permit suicide and attempted suicide, recognize the right of competent terminally ill patients--either on their own or through agents--to order the ceasing of nutrition and hydration and the withdrawal of life support systems, but do not alter the law to permit what petitioners seek today. NEW YORK STATE TASK FORCE ON LIFE AND THE LAW, WHEN DEATH IS SOUGHT: ASSISTED SUICIDE AND EUTHANASIA IN THE MEDICAL CONTEXT 142-46 (1994). The Legislature received the report and, not surprisingly, took no action, then or since.
 
 
 104
 From this historical survey, I conclude that 1) what petitioners seek is nominally still forbidden by New York statutes; 2) the bases of these statutes have been deeply eroded over the last hundred and fifty years; and 3) few of their foundations remain in place today.
 
 Specifically:
 
 105
 . The original reason for the statutes--criminalizing conduct that aided or abetted other crimes--is long since gone.
 
 
 106
 . The distinction that has evolved over the years between conduct currently permitted (suicide, and aiding someone who wishes to die to do so by removing hydration, feeding, and life support systems) and conduct still prohibited (giving a competent, terminally ill patient lethal drugs, which he or she can self-administer) is tenuous at best.[8]
 
 
 107
 . The Legislature--for many, many years--has not taken any recognizably affirmative step reaffirming the prohibition of what petitioners seek.
 
 
 108
 . The enforcement of the laws themselves has fallen into virtual desuetude--not so much as to render the case before us nonjusticiable, but enough to cast doubt on whether, in a case like that which the petitioners present, a prosecutor would prosecute or a jury would convict. And this fact by itself inevitably raises doubts about the current support for these laws.[9]
 
 II. Constitutional Doubts
 
 109
 In the case of ordinary legislation none of this would matter much. We regularly uphold laws whose original reason has vanished, whose fit with the rest of the legal system is dubious, whose enforcement is virtually nil, and whose continued presence on the books seems as much due to the strong inertial force that the framers of our constitutions gave to the status quo as to any current majoritarian support. In a different context, I have argued that courts have used subterfuges and aggressive interpretations to rid the system of such laws. See GUIDO CALABRESI, A COMMON LAW FOR THE AGE OF STATUTES 163-66, 172-77 (1982). But I have also criticized such judicial action, at least in the absence of express legislative sanction. See id.; Taber v. Maine, 67 F.3d 1029, 1039 (2d Cir.1995).
 
 
 110
 When legislation comes close to violating fundamental substantive constitutional rights or to running counter to the requirements of Equal Protection, however, there is, as I hope to demonstrate, a long tradition of constitutional holdings that inertia will not do. In such instances, courts have asserted the right to strike down statutes and, before ruling on the ultimate validity of that legislation, to demand a present and positive acknowledgment of the values that the legislators wish to further through the legislation in issue. And so it is to an examination of the substantive constitutional dubiety of the laws before us that I now turn.
 
 
 111
 There can be no doubt that the statutes at issue come close--at the very least--to infringing fundamental Due Process rights and to doing so in ways that are also suspect under the antidiscrimination principles of the Equal Protection Clause. While differing in emphasis, the various opinions of the Supreme Court in Cruzan v. Director, Missouri Department of Health, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), and in Planned Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), as well as the en banc opinion of the Ninth Circuit in Companion in Dying, and the strongly argued majority opinion in this case, make that abundantly clear.
 
 
 112
 In Cruzan, the Court examined whether guardians could order withdrawal of an incompetent patient's life support when, contrary to the requirements of the State of Missouri, there was not clear and convincing proof of the patient's wish to have life support withdrawn. In deciding that the guardians could not so order, the majority opinion noted that "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions." 497 U.S. at 278, 110 S.Ct. at 2851. It went on to describe the decision to withdraw life support as "deeply personal" and noted that "[i]t cannot be disputed that the Due Process Clause protects an interest in life as well as an interest in refusing life-sustaining medical treatment." Id. at 281, 110 S.Ct. at 2853.
 
 
 113
 Various Justices expanded on this theme. Justice O'Connor, concurring, wrote, "I agree that a protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions, see ante, at 278-79 [110 S.Ct. at 2851-52], and that the refusal of artificially delivered food and water is encompassed within that liberty interest. See ante, at 279 [110 S.Ct. at 2851-52]." Id. at 287, 110 S.Ct. at 2856. She then added, "Requiring a competent adult to endure such procedures against her will burdens the patient's liberty, dignity, and freedom to determine the course of her own treatment. Accordingly, the liberty guaranteed by the Due Process Clause must protect, if it protects anything, an individual's deeply personal decision to reject medical treatment, including the artificial delivery of food and water." Id. at 289, 110 S.Ct. at 2857. Justice Brennan, joined by Justices Marshall and Blackmun, dissenting, made a similar point: "Dying is personal. And it is profound. For many, the thought of an ignoble end, steeped in decay, is abhorrent. A quiet, proud death, bodily integrity intact, is a matter of extreme consequence." Id. at 310-11, 110 S.Ct. at 2868. In turn, Justice Stevens, also dissenting, powerfully noted: "Choices about death touch the core of liberty. Our duty, and the concomitant freedom, to come to terms with the conditions of our own mortality are undoubtedly 'so rooted in the traditions and conscience of our people as to be ranked as fundamental....' " Id. at 343, 110 S.Ct. at 2885.
 
 
 114
 Even Justice Scalia, who was the only member of the Court to find that no liberty interest was implicated, recognized that such issues touch the essence of our humanity. He argued that the Constitution was silent on the question of whether one had a liberty interest in refusing life support, and that such a right could not be found in our history and tradition. Id. at 293-96, 110 S.Ct. at 2859-61 (Scalia, J., concurring). He then went on to say: "Are there, then, no reasonable and humane limits that ought not to be exceeded in requiring an individual to preserve his own life? There obviously are, but they are not set forth in the Due Process Clause. What assures us that those limits will not be exceeded is the same constitutional guarantee that is the source of most of our protection--what protects us, for example, from being assessed a tax of 100% of our income above the subsistence level, from being forbidden to drive cars, or from being required to send our children to school for 10 hours a day, none of which horribles are categorically prohibited by the Constitution. Our salvation is the Equal Protection Clause, which requires the democratic majority to accept for themselves and their loved ones what they impose on you and me." Id. at 300, 110 S.Ct. at 2863. Significantly, as the majority today points out, Justice Scalia also made clear that he recognized no sensible difference between assisted suicide (of the sort involved in the case before us) and assisted removal of life support and feeding tubes. "[T]he cause of death in both cases is the suicide's conscious decision to 'pu[t] an end to his own existence.' " Id. at 295-97, 110 S.Ct. at 2860-61 (Scalia, J., concurring).
 
 
 115
 Although the Court in Cruzan did not ultimately decide whether a patient had a constitutionally protected right to die, the majority opinion clearly recognized that any infringement of such a liberty interest was at least constitutionally suspect.[10] It said, "Petitioners insist that under the general holdings of our cases, the forced administration of life-sustaining medical treatment, and even of artificially delivered food and water essential to life, would implicate a competent person's liberty interest. Although we think the logic of the cases discussed above would embrace such a liberty interest, the dramatic consequences involved in refusal of such treatment would inform the inquiry as to whether the deprivation of that interest is constitutionally permissible. But for purposes of this case, we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition." Id. at 279, 110 S.Ct. at 2852.
 
 
 116
 What is more, the Court in Cruzan did not merely "assume" that a liberty interest in refusing life-sustaining medical treatment existed. It found that a prohibition of life-support termination would deprive a patient of that liberty interest. In doing so, the Court noted that "determining that a person has a 'liberty interest' under the Due Process Clause does not end the inquiry," and that "whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." Id. at 279, 110 S.Ct. at 2851-52 (internal quotation marks and citation omitted). It then "assumed" that when a patient's liberty interest was balanced against Missouri's interest in life, the balance would come out in favor of the patient.
 
 
 117
 Cruzan never actually struck this balance, of course, because the Court found that Missouri could insist on strong evidentiary requirements to ensure that Cruzan wanted to die, since "the Due Process Clause protects an interest in life as well as an interest in refusing life-sustaining medical treatment," id. at 281, 110 S.Ct. at 2853. But this in no way undermines Cruzan 's holding that in determining whether a patient has a constitutional right to die, we are required to "balance" the consequences of the state's prohibition of life-support termination against the state's interest in preserving life. Id. at 279, 110 S.Ct. at 2851-52.
 
 
 118
 Cruzan, therefore, teaches us that statutes that interfere with an individual's decision to terminate life are suspect under the Due Process Clause. The right to act on that decision is one that may or may not receive ultimate constitutional protection, however, depending on the power of the state's interests and the clarity with which those interests are expressed. Moreover, as Justice Scalia in his concurrence points out, the Equal Protection Clause also requires courts to examine whether such statutes apply equally to "you and me"--regardless of whether the prohibited activity interferes with a fundamental right or disadvantages a suspect class.
 
 
 119
 Like Cruzan, Casey suggests that New York's assisted suicide statutes are of doubtful constitutionality. In Casey, the Court noted that "[o]ur law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education" and that "the Constitution places limits on a State's right to interfere with a person's most basic decisions about ... bodily integrity." 505 U.S. at 851, 849, 112 S.Ct. at 2806-07, 2806. In this respect, Casey borrowed from Justice Harlan's formulation in Poe v. Ullman, 367 U.S. 497, 543, 81 S.Ct. 1752, 1776-77, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting), 505 U.S. at 848-49, 112 S.Ct. at 2805-06, and defined liberty interests to include choices at the core of human existence. Following Harlan, it stated: "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence.... Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." Id. at 851, 112 S.Ct. at 2807.
 
 
 120
 Today's majority and the Ninth Circuit, en banc, in Compassion in Dying, go further than the Supreme Court did in Cruzan and Casey. These circuits--the first to rule on the matter--hold that laws prohibiting physicians from assisting suicide in some circumstances actually violate the Constitution. The majority does so because it can see no valid Equal Protection difference between the so-called "passive" assistance that New York allows and the "active" assistance that New York purports to forbid. The Ninth Circuit, instead, finds a violation of a fundamental Due Process right.[11]
 
 
 121
 In light of these opinions, I believe that it cannot be denied that the laws here involved, whether tested by Due Process or by Equal Protection, are highly suspect. It is also the case, however, that neither Cruzan, nor Casey, nor the language of our Constitution, nor our constitutional tradition clearly makes these laws invalid. What, then, should be done?
 
 III. The Constitutional Remand
 
 122
 I contend that when a law is neither plainly unconstitutional (because in derogation of one of the express clauses of our fundamental charter or, for that matter, of the more general clauses, as these have been interpreted in our constitutional history and traditions), nor plainly constitutional, the courts ought not to decide the ultimate validity of that law without current and clearly expressed statements, by the people or by their elected officials, of the state interests involved. It is my further contention, that, absent such statements, the courts have frequently struck down such laws, while leaving open the possibility of reconsideration if appropriate statements were subsequently made.
 
 
 123
 Thus, in Kent v. Dulles, 357 U.S. 116, 129, 78 S.Ct. 1113, 1119-20, 2 L.Ed.2d 1204 (1958), in striking down a State Department directive limiting citizens' passport rights, the Supreme Court, said: "Where activities or enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them. We hesitate to find in this broad generalized power an authority to trench so heavily on the rights of the citizen.... Thus we do not reach the question of constitutionality. We only conclude that § 1185 and § 211a do not delegate to the Secretary the kind of authority exercised here." And in Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), in voiding a loyalty-security program that did not provide for confrontation of witnesses, the Court stated: "[Legislative and executive decisions] must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized, but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws." Id. at 507, 79 S.Ct. at 1419 (citation omitted)
 
 
 124
 The same view was expressed even by the great constitutional absolutist, Justice Hugo L. Black. In Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959), in dissent, he argued that the authority of the House UnAmerican Activities Committee to investigate communism in education should be limited, "[f]or we are dealing here with governmental procedures which the Court itself admits reach to the very fringes of congressional power. In such cases more is required of legislatures than a vague delegation to be filled in later by mute acquiescence." Id. at 139-40, 79 S.Ct. at 1100 (footnote omitted).[12]
 
 
 125
 While these earlier cases leaned in part on statutory interpretation or on broad readings of doctrines such as delegation and vagueness, more recent opinions have applied constitutional remands directly.[13] In Califano v. Goldfarb, 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977), for example, Justice Stevens provided the swing vote in the Court's five-to-four decision that the Social Security Act's grant of special benefits to widows was in violation of Equal Protection. He found that the law discriminated "against a group of males [and] is merely the accidental byproduct of a traditional way of thinking about females." Id. at 233, 97 S.Ct. at 1040 (Stevens, J., concurring). Significantly, he went on to say that "[p]erhaps an actual, considered legislative choice would be sufficient to allow this statute to be upheld, but that is a question I would reserve until such a choice has been made." Id. at 223 n. 9, 97 S.Ct. at 1035 n. 9.[14]
 
 
 126
 The powerful, and telling, concurring opinion by Justice O'Connor in Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), which provided the fifth vote to strike down state death penalty laws applicable to minors less than sixteen years of age, did the same thing. The fact that such laws were on the books in many states did not suffice to meet the strictures of the Cruel and Unusual Punishment Clause. The laws may have been there inadvertently or as a result of inertia, and many state legislatures seemed not to have realized that children could be executed under their statutes. Such laws, moreover, were virtually never enforced against minors under sixteen. Hence, the Justice reasoned, they were invalid. But if states reenacted them, consciously and clearly, the Court would then have to consider whether the statutes could actually meet the Clause's requirements. Id. at 857, 108 S.Ct. at 2710-11 (O'Connor, J., concurring in the judgment).
 
 
 127
 Perhaps the most dramatic instance of this constitutional remand, or second look, approach occurred in our own Circuit, in a case bearing many similarities to the one before us today. In Abele v. Markle, 342 F.Supp. 800 (D.Conn.1972) ("Abele I "), a three-judge district court was asked to examine the constitutionality of a Connecticut statute that banned abortion. Circuit Judge J. Edward Lumbard found the statute to be unconstitutional for reasons later echoed by the Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). District Judge T. Emmet Clarie found no violation of due process for reasons akin to those adverted to in today's majority opinion. The key vote was by then-District Judge Jon Newman.
 
 
 128
 In his landmark opinion, now-Chief Judge Newman found that the Connecticut statute had been passed in 1860 to protect the health of pregnant women, and that this aim was no longer applicable in 1972 because childbirth endangered a woman's life more than abortion did. Id. at 807-09 (Newman, J., concurring). Yet he recognized that other valid grounds for the statute might exist, including, perhaps, the protection of unborn life (Roe v. Wade had not yet been decided). Newman pointed out, however, that the statute was not passed to protect unborn life. "If the Connecticut legislature had made [such] a judgment," Newman mused, "the constitutionality of such laws would pose a legal question of extreme difficulty...." Id. at 810. Because "that legislative determination has not been shown to have been made," Newman found it "inappropriate to decide the constitutional issue that would be posed" if the Legislature in fact passed a law designed to protect human life. Id. And since the statute before him, whatever its basis, raised strong constitutional doubts, Newman nullified the law while explicitly leaving the Legislature free to reconsider the issue.
 
 
 129
 Judge Newman's opinion is, of course, not binding on us. But it remains an important beacon suggesting what is the correct approach in extremely difficult cases in which neither the Supreme Court, nor constitutional language or tradition, gives clear guidance. It tells us how to deal with situations in which the state interests that might support such statutes can only be inferred from legislative inaction or from long-abandoned legislative motives.
 
 
 130
 Today, Timothy Quill takes the place of Janice Abele in challenging another statute of nineteenth-century origin. As with the Connecticut abortion law, the rationale for the New York assisted-suicide prohibition has eroded with the passage of time. In the nineteenth century, both suicide and attempted suicide were crimes and assisting in those crimes was, derivatively, a crime as well. But suicide and attempted suicide are no longer crimes. Nevertheless, the prohibitions on assisted suicide might serve other valid ends. It is possible, for example, to imagine a state in which such statutes were part of an overall approach to the preservation of life that was so all-encompassing that the laws' validity might be upheld despite their infringement of important libertarian individual rights. Our Constitution gives us no more complete dominion over our bodies than it does over our property. See, e.g., Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (holding that a state may, over a suspect's protest, have a physician extract blood from a person suspected of drunk driving). In other words, our Constitution does not enact the bodily equivalent of Herbert Spencer's Social Statics. Cf. Lochner v. New York, 198 U.S. 45, 75, 25 S.Ct. 539, 546-47, 49 L.Ed. 937 (1905) (Holmes, J., dissenting). But there is no sign that such an overall "culture of life" reigns in New York State--quite the contrary.
 
 
 131
 Well before Roe v. Wade, New York enacted one of the most permissive abortion laws in the country. See Roe, 410 U.S. 113, 147-48 & n. 41, 93 S.Ct. 705, 724 & n. 41, 35 L.Ed.2d 147 (1973). New York recently reenacted the death penalty. See Act of Mar. 7, 1995, ch. 1, § 2, 1995 N.Y. Laws 1 (McKinney's) (codified at N.Y. Penal Law § 60.06 (McKinney's Supp.1996)). As far as I know, no New York Legislature has seriously considered requiring individuals to give their blood, bone marrow or other organs, to keep those who need transplants alive. Indeed, such an idea would strike many as bizarre science fiction. Nearer to hand, the right to demand to die, as and when one wishes, has been recognized in New York for all those on feeding or hydration tubes or on other life support devices. All this the majority opinion demonstrates beyond peradventure.
 
 
 132
 Various amici for the respondents argue that the New York assisted suicide laws consciously adopt their particular vision of what life and death should be. Amicus United States Catholic Conference, for example, insists that suicide is antithetical to freedom, that it is not voluntary and that it is linked to psychiatric illness. But there is no reason to believe that New York has accepted these arguments. If it had, one would expect that New York would prohibit attempted suicide and that it would, for example, aggressively discourage suicide by the terminally ill, through legislative declarations defining it to be a "grave public wrong" or through some other means.
 
 
 133
 Other amici contend that the difference between what they call "active" assisted suicide (making lethal drugs available to those terminally ill who would self-administer them) and what they call "passive" behavior (actively removing life supports or feeding tubes, on demand, so that the patient may die) is fundamental. Even if I were to accept the distinction in the face of the powerful arguments made against it both by the majority today and by Justice Scalia in his Cruzan concurrence, there is no reason to believe that New York has consciously made such a judgment. Certainly New York has never enacted a law based on a reasoned defense of the difference.
 
 
 134
 The Attorney General of New York contends that its Legislature has, in fact, made just such a distinction by its inaction, by its failure to remove the prohibitions before us today. It left these in place after the prohibition on what could be called "passive" assisted suicide had been abrogated. Leaving aside the difficulties involved in arguing that legislative inaction should be given the same weight as legislative action in supporting the view that medical action and medical inaction are fundamentally different, the argument will not do. As the majority points out, we have not been given any clear statements of possible interests that the state actually believes would be served by the distinction. In their absence, how can we say that the distinction, which is anything but obvious, and which results in severe harm to the ability of some, but not all, individuals to determine crucial life and death choices for themselves, is mandated by the state's fundamental needs? And if the state does not affirmatively tell us what it wishes to put on the other side of the scale, how can we make the balance required by Cruzan come out any way but in favor of an individual's freedom to choose between life and death? Whether under Equal Protection, or Due Process, then, the absence of a recent, affirmative, lucid and unmistakable statement of why the state wishes to interfere with what has been held by the Supreme Court to be a significant individual right, dooms these statutes.
 
 
 135
 I take no position on what I would hold were such an affirmative statement forthcoming from the state of New York. In the wake of Furman v. Georgia, 408 U.S. 238, 239-40, 92 S.Ct. 2726, 2727, 33 L.Ed.2d 346 (1972) (per curiam), which in effect sent all of the then-existing death penalty laws back for a second look by the states, the Supreme Court (rightly or wrongly) upheld most of the somewhat modified and subsequently enacted death penalty laws. See Gregg v. Georgia, 428 U.S. 153, 179-81, 96 S.Ct. 2909, 2928-29, 49 L.Ed.2d 859 (1976) (plurality opinion). Conversely, one month after Judge Newman's concurrence in Abele I, Connecticut enacted a new anti-abortion law that was based on protecting the life of the fetus. Pub. Act No. 1, 1972 Conn. Acts 593 (May Spec.Sess.) (codified at Conn. Gen.Stat. § 53-30(a)-(b)). And the same panel that had decided Abele I (rightly or wrongly) declared the new law unconstitutional.[15] Either result is possible after a second look in which the state affirms laws that it previously had allowed to remain in force through passivity or inertia.[16] What I do say is that no court need or ought to make ultimate and immensely difficult constitutional decisions unless it knows that the state's elected representatives and executives--having been made to go, as it were, before the people--assert through their actions (not their inactions) that they really want and are prepared to defend laws that are constitutionally suspect.
 
 
 136
 It is different when the Constitution speaks clearly. When a law violates the plain mandates of the text, history, or structure of the Constitution, no second look is warranted or appropriate. That law must fall. Laws that violate the core of the First Amendment and the core of the Takings Clause are but two examples. When that is not the case, when the Constitution and its history do not clearly render a statute invalid, when its validity depends instead, in part, on the strength of the state interests at stake, then a second look is not only appropriate, it is, in my view, usually required.
 
 
 137
 Without a second look by the people, courts are liable to err in either direction. They may uphold and thereby validate[17] (as they all too often have[18]) the infringement of rights upon which the states did not truly wish to encroach. Conversely, they may, ultimately and definitively, strike down laws, believing that the state interests involved are minor, when in fact these interests turn out to be highly significant.[19]
 
 
 138
 In the end, a constitutional remand does no more than this: It tells the legislatures and executives of the various states, and of the federal government as well, that if they wish to regulate conduct that, if not protected by our Constitution, is very close to being protected, they must do so clearly and openly. They must, in other words, face the consequences of their decision before the people.[20] Unless they do this, they cannot expect courts to tell them whether what they may or may not actually wish to enact is constitutionally permitted.
 
 IV. Conclusion
 
 139
 For all of the above reasons, I do not reach the merits in this case--merits that are, as Judge Newman said of those that he also did not reach in Abele v. Markle, "of extreme difficulty." 342 F.Supp. at 810. What, after all, are we to make of Margaret Mead's statement, cited in one of the amicus briefs, that we should beware of giving those who have the power to heal the right to kill, since anthropologically speaking the distinction between the two is relatively new in our cultures? It is certainly worth pondering. But how does it help us to distinguish between giving doctors the right to remove life support systems and the right of the terminally ill to demand lethal drugs from the same doctors? And how is one to weigh petitioners' claim that if doctors are not allowed to give patients lethal drugs for self-administration, those patients will be forced to commit suicide, legally, in far more horrendous ways--by hanging, shooting, or gassing themselves? These methods, petitioners assert, are plausibly more dangerous to society and devastating to survivors. But is it really the case that terminally ill patients would take such measures? And which way would it cut, if they did not? These questions, moreover, hardly begin to approach the human tragedies, and the deeply held beliefs, that the issues we would have to decide would require us to explore. No. Unless New York forces us to face such choices head on, by asserting its interest in the prohibitions before us, we should not do so. And this New York has not done.
 
 
 140
 I would hold that, on the current legislative record, New York's prohibitions on assisted suicide violate both the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution to the extent that these laws are interpreted to prohibit a physician from prescribing lethal drugs to be self-administered by a mentally competent, terminally ill person in the final stages of that terminal illness. I would, however, take no position on whether such prohibitions, or other more finely drawn ones, might be valid, under either or both clauses of the United States Constitution, were New York to reenact them while articulating the reasons for the distinctions it makes in the laws, and expressing the grounds for the prohibitions themselves. I therefore concur in the result reached by the Court.
 
 
 
 *
 The Honorable Milton Pollack of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 On March 15, 1996, Delury pleaded guilty to second-degree attempted manslaughter. Pam Belluck, Man Will Get Prison Term for Helping His Wife Kill Herself, N.Y. Times, Mar. 16, 1996, at 23, 26
 
 
 [2]
 On rehearing in banc, the Ninth Circuit vacated the decision of the panel and affirmed the decision of the district court. Compassion in Dying v. Washington, 79 F.3d 790 (9th Cir.1996) (in banc)
 
 
 [3]
 There are those who use the terms "assisted suicide" and "euthanasia" interchangeably. See Patricia A. Unz, Note, Euthanasia: A Constitutionally Protected Peaceful Death, 37 N.Y.L. Sch. L.Rev. 439, 439 n. 8 (1992). While euthanasia is derived from the Greek words meaning "good death," id. at 441, it seems clear that most states, including New York, make a distinction between the two acts. See When Death Is Sought, supra, at 63. In euthanasia, one causes the death of another by direct and intentional acts. Id. Accordingly, euthanasia falls within the definition of murder in New York. See N.Y. Penal Law § 125.25(1) (McKinney 1987)
 
 
 [4]
 For example, the state might take steps to assure the competence of prescribing physicians by imposing education and training qualifications, including pain management; it may require the establishment of local ethics committees as resources for physicians faced with questions relating to requests for lethal medications; it could specify the information to be furnished to the patient to ascertain that the patient's choice is a fully voluntary one; it might require consultations with other physicians for further diagnosis and prognosis in regard to the patient's illness, for psychiatric evaluation, and for evaluation of pain control possibilities; it may provide a time delay between a request for lethal medication and the prescription in order to allow a time for reflection; and it may suggest some sort of notification to the patient's family
 Recently, a group of physicians known as "Physicians for Mercy" proposed ten guidelines for doctor-assisted suicide. Doctors Offer Some Support to Kevorkian: Urge 10 Guidelines in Assisting Suicide, N.Y. Times, Dec. 5, 1995, at A21. These guidelines call for a physician who assists in suicide, called an "obitiatrist," to refer his patients to a psychiatrist, a specialist in the patient's specific illness, and, if necessary, a specialist in pain management, before acting at the behest of a mentally competent person with an incurable affliction. Id. "Physicians for Mercy" has decided to call the practice of physician assisted suicide "patholysis," a term coined by Dr. Jack Kevorkian, who has assisted in more than two dozen suicides. Id. However, Dr. Kevorkian's assistance has not been rendered exclusively to those beset by terminal illnesses. Bruce Fein, The Right to Determine One's Exit from Life, Wash. Times, Jan. 23, 1996, at A14.
 
 
 [1]
 See NEW YORK STATE TASK FORCE ON LIFE AND THE LAW, WHEN DEATH IS SOUGHT: ASSISTED SUICIDE AND EUTHANASIA IN THE MEDICAL CONTEXT 57 (1994) ("No person has been convicted in New York State of manslaughter for intentionally aiding or causing a suicide.... The reluctance to bring such cases no doubt rests in part on the degree of public sympathy [such cases] often arouse, and the resulting difficulty of securing an indictment and conviction."); Compassion in Dying, 79 F.3d at 811 (footnotes omitted) ("[T]he mere presence of statutes criminalizing assisting in a suicide does not necessarily indicate societal disapproval. That is especially true when such laws are seldom, if ever, enforced. There is no reported American case of criminal punishment being meted out to a doctor for helping a patient hasten his own death.... Running beneath the official history of legal condemnation of physician-assisted suicide is a strong undercurrent of a time-honored but hidden practice of physicians helping terminally ill patients to hasten their deaths.")
 
 
 [2]
 See Compassion in Dying, 79 F.3d at 846-47 (Beezer, J., dissenting)
 
 
 [3]
 The 1937 New York Report of the Law Revision Commission explicitly found that "[t]he history of the [abetting and advising suicide] provision is traceable into the ancient common law when a suicide or felo de se was guilty of a crime punishable by forfeiture of his goods and chattels. One who encouraged or aided him was guilty as an accessory to the crime of 'self-murder'...." STATE OF NEW YORK, REPORT OF THE LAW REVISION COMMISSION FOR 1937, at 830 (1937)
 
 
 [4]
 See supra note 1
 
 
 [5]
 The 1965 Act did provide that "[a] person acting under a reasonable belief that another person is about to commit suicide or to inflict serious physical injury upon himself may use physical force upon such person to the extent that he reasonably believes it necessary to thwart such result." Act of July 20, 1965, ch. 1030, 1965 N.Y. Laws 2355 (codified at N.Y. Penal Law § 35.10(4)). See Von Holden v. Chapman, 87 A.D.2d 66, 68, 450 N.Y.S.2d 623, 626 (4th Dep't 1982) (upholding order authorizing forced feeding of John Lennon's murderer, Mark David Chapman, to prevent Chapman from starving himself to death because "[t]he preservation of life has a high social value in our culture")
 
 
 [6]
 Why the legislature left the prohibition of assisted suicide in the law, and whether it thought about the issue at all is hard to say. The 1937 Law Revision Report had, in a sense, presaged the event when it said that since New York had removed "all stigma [of suicide] as a crime" and that "[s]ince liability as an accessory could no longer hinge upon the crime of a principal, it was necessary to define it as a substantive offense." REPORT OF THE LAW REVISION COMMISSION, supra note 3, at 831. The Commission seemed to have been concerned primarily with those who talked others into killing themselves. It noted the important difference between aiding someone who had a mind-set to commit suicide and the "more dangerous" person "working upon the mind of a susceptible person to induce suicide," id. at 832
 
 
 [7]
 The 1990 Act provided the following caution: "This article is not intended to permit or promote suicide, assisted suicide, or euthanasia; accordingly, nothing herein shall be construed to permit an agent to consent to any act or omission to which the principal could not consent under law." N.Y. Pub. Health Law § 2989(3). The full significance of this section is not clear. It understandably limited the agent to doing those acts to which the principal, on whose behalf the agent is acting, could consent. It also seemed to leave in place the status quo both as to those acts, like suicide, which were no longer crimes and those, like assisted suicide, which nominally were. But the section did not go further, as New York claims in a letter brief where it says, citing § 2989(3), that "New York's legislature expressly rejected permitting physician assisted suicide." Section 2989(3) did not speak to this any more than it spoke to the legality of suicide
 
 
 [8]
 See ante at 728-31 (the majority opinion's powerful discussion of the weakness of the distinction)
 
 
 [9]
 We note in passing that a jury in Michigan recently acquitted Dr. Jack Kevorkian after he argued (despite his earlier, quite explicit, publicity and statements) that all he was doing was ending pain. See Todd Nissen, Kevorkian Found Not Guilty in Assisted Suicide Trial, Reuters, Mar. 8, 1996. We note also that Iowa has just enacted a law forbidding assisted suicide and that this law does not prohibit "the responsible actions of a licensed health professional to administer pain medication to a patient with a terminal illness." See Gov. Branstad Signs Bill Outlawing Assisted Suicide, BNA Health Care Daily, Mar. 5, 1996
 
 
 [10]
 Both Justices O'Connor and Scalia joined Chief Justice Rehnquist's opinion, making it an opinion for the Court. Their own concurring opinions, however, gave significantly different glosses to the Court's opinion. See Cruzan, 497 U.S. at 287, 110 S.Ct. at 2856 (O'Connor, J., concurring) ("As the Court notes, the liberty interest in refusing medical treatment flows from decisions involving the State's invasions into the body. See ante, at 278-279 [110 S.Ct. at 2851-52]"); id. at 293, 110 S.Ct. at 2859 (Scalia, J. concurring) ("While I agree with the Court's analysis today, and therefore join in its opinion, I would have preferred that we announce, clearly and promptly, that the federal courts have no business in this field....")
 
 
 [11]
 And some distinguished scholars agree. See, e.g., Jed Rubenfeld, The Right of Privacy, 102 HARV. L. REV . 737, 794-95 (1989) ("If the decision to live or die is said to be so fundamental to a person that the state may not make it for him, then it is difficult to see on what plausible ground the right to make this decision could be granted to those on life support but denied to all other individuals."). There are, of course, distinguished scholars who disagree. See, e.g., Yale Kamisar, Against Assisted Suicide--Even a Very Limited Form, 72 DETROIT MERCY L. REV. 735, 753-60 (1995)
 
 
 [12]
 The Court's opinion in Kent and Justice Black's dissent in Barenblatt relied in part on a pair of delegation opinions by Chief Justice Hughes dating from the 1930s. These were treated as using a similar approach because, in the 1930s, the statutes at issue were at the fringes of congressional power under the Commerce Clause. See Kent, 357 U.S. at 129, 78 S.Ct. at 1119-20 (citing Panama Refining Co. v. Ryan, 293 U.S. 388, 420-30, 55 S.Ct. 241, 248-53, 79 L.Ed. 446 (1935)); Barenblatt, 360 U.S. at 140 n. 7, 79 S.Ct. at 1100 n. 7 (Black, J., dissenting) (citing Panama Refining and A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935))
 
 
 [13]
 Interpretation to avoid constitutional questions and undue delegation have proven particularly useful to the Supreme Court as ways of sending back for a second look federal statutes that came close to infringing fundamental rights. These devices, however, are either not available or are problematic when the statute that skates close to a constitutional line is a state law, since both what can and cannot be delegated within a state and how a state statute should be interpreted are paradigmatic issues of state law. Compare Sweezy v. New Hampshire, 354 U.S. 234, 254, 77 S.Ct. 1203, 1213-14, 1 L.Ed.2d 1311 (1957) (plurality opinion applying a concept akin to undue delegation to find that "[t]he lack of any indications that the legislature wanted the information the Attorney General attempted to elicit from petitioner must be treated as the absence of authority. It follows that the use of the contempt power ... was not in accordance with ... due process") with id. at 254-55, 77 S.Ct. at 1214 (Frankfurter, J., concurring in the result) (disagreeing with plurality on this issue because "whether the Attorney General of New Hampshire acted within the scope of the authority given him by the state legislature is a matter for the decision of the courts of that State, as it is for the federal courts to determine whether an agency to which Congress has delegated power has acted within the confines of its mandate"). In such circumstances, a reconsideration can occur at the behest of a federal court only if that court is willing impose a constitutional remand directly. See infra (discussion of Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), and Abele v. Markle, 342 F.Supp. 800 (D.Conn.1972))
 
 
 [14]
 The other four votes in the majority held that the statute was an invalid discrimination against women. Califano, 430 U.S. at 217, 97 S.Ct. at 1032 (plurality opinion)
 
 
 [15]
 See Abele v. Markle, 351 F.Supp. 224, 232 (D.Conn.1972) (" Abele II "). Then-District Judge Newman's opinion noted that, "for the author of this opinion," the Legislature's new "statement of legislative purpose makes the issue posed ... quite different from the issue raised by the challenge to the prior statutes.... A statute of this sort, as I previously indicated [in Abele I ], 342 F.Supp. at 810 and 811 n. 18, poses a far more difficult question, one that I did not believe should be decided unless such a statute was enacted." Id. at 226 n. 4. Judge Newman's opinion was joined by Judge Lumbard, while Judge Clarie dissented. The Supreme Court subsequently vacated the decision in light of Roe, 410 U.S. 951, 93 S.Ct. 1417, 35 L.Ed.2d 683 (1973), and remanded the case to the district court. On remand, the same three judges declared the law unconstitutional. Abele v. Markle, 369 F.Supp. 807, 809 (D.Conn.1973) (per curiam)
 
 
 [16]
 Sometimes, of course, a legislature will not reenact a statute that has been remanded to it, or will reenact it with modifications and limits sufficient to avoid any serious constitutional challenge
 
 
 [17]
 See CHARLES L. BLACK, JR., THE PEOPLE AND THE COURT: JUDICIAL REVIEW IN A DEMOCRACY 52 (1960) ("[T]he Court, through its history, has acted as the legitimator of the government. In a very real sense, the Government of the United States is based on the opinions of the Supreme Court.")
 
 
 [18]
 See Guido Calabresi, The Supreme Court, 1990 Term--Foreword: Antidiscrimination and Constitutional Accountability (What the Bork-Brennan Debate Ignores), 105 HARV. L. REV . 80, 143-45 (1991)
 
 
 [19]
 See Harry Wellington, Common Law Rules and Constitutional Double Standards: Some Notes on Adjudication, 83 YALE L.J. 221 (1973); Alexander Bickel & Harry Wellington, Legislative Purpose and the Judicial Process: The Lincoln Mills Case, 71 HARV. L. REV . 1 (1957); Alexander Bickel, The Supreme Court, 1960 Term--Foreword: The Passive Virtues, 75 HARV. L. REV . 40 (1961)
 
 
 [20]
 In this respect, the notion of a constitutional remand may respond to some of the concerns expressed by the dissenters in Companion in Dying. See Compassion in Dying, 79 F.3d at 856 (Beezer, J. dissenting) ("Whether the charitable or uncharitable characterization [of physician-assisted suicide] ultimately prevails is a question that must be resolved by the people through deliberative decisionmaking in the voting booth ... This issue we, the courts, need not--and should not--decide.... To declare a constitutional right to physician-assisted suicide would be to impose upon the nation a repeal of local laws."); id. at 857 (Fernandez, J., dissenting) ("Like so many other issues, it is one 'for the people to decide.' Our Constitution leaves it to them; it is they and their representatives who must grapple with the riddle and solve it.") (citation omitted); id. at 857 (Kleinfeld, J., dissenting) ("The Founding Fathers did not establish the United States as a democratic republic so that elected officials would decide trivia, while all great questions would be decided by the judiciary.... That an issue is important does not mean that the people, through their democratically elected representatives, do not have the power to decide it."). See also 1 BRUCE ACKERMAN, WE THE PEOPLE: FOUNDATIONS (1991); CAN. CONST . (Constitution Act, 1982), pt. I (Canadian Charter of Rights and Freedoms) § 33 (containing the Non-Obstante Clause that permits legislature to abrogate rights, but only if the legislature explicitly decides to do so)