COMPASSION IN DYING, a Washington nonprofit corporation; Jane Roe; John Doe; James Poe; Harold Glucksberg, M.D., Plaintiffs–Appellees,

v.

STATE OF WASHINGTON; Christine Gregoire, Attorney General of Washington, Defendants–Appellants.

No. 94–35534.

United States Court of Appeals, Ninth Circuit.

June 12, 1996.

Before: HUG, Jr., Chief Judge, BROWNING, SCHROEDER, FLETCHER, PREGERSON, REINHARDT, BEEZER, WIGGINS, THOMPSON, FERNANDEZ, KLEINFELD, O'SCANNLAIN and TROTT, Circuit Judges.

**AMENDED ORDER**

An active judge sua sponte requested that the full court rehear this case en banc. The request failed to receive a majority of the votes of the non-recused active judges. The request is rejected.

O'SCANNLAIN, Circuit Judge, joined by TROTT and KLEINFELD, Circuit Judges, dissenting from order rejecting request for rehearing en banc by the full court:

By promulgating a new constitutional right, one unheard of in over two hundred years of American history, six men and two women—endowed with life tenure and cloaked in the robes of this court—have enacted by judicial fiat what the people of the State of Washington declined to do at the polls only five years ago.[1] By our failure to convene the full court to rehear this case, a mere one-third of the twenty-four active judges [2] eligible to vote has been empowered to strike down criminal laws, not just in Washington, but in Alaska, Arizona, California, Hawaii, and Montana, as well as in Idaho

---

1. In November 1991, the people of Washington rejected Initiative 119, which would have permitted physicians to assist terminally ill patients in committing suicide.

2. At the time of the filing of this order there are five vacancies on this 28–judge court. *See* 28 U.S.C. § 44. However, one judge took senior status after the voting began, but prior to this filing, reducing the current membership to 23.

and Nevada to the extent they criminalize assisted suicide through common law, as they currently do. Because our failure to rehear this case as a full court permits a minority of our court to nullify the public will without adequate justification, I must respectfully dissent.

## I

The Ninth Circuit Court of Appeals is the only appellate court in the federal system (indeed, in either the federal or state appellate systems) which permits a case to be reheard by a limited en banc court.[3] In every other federal court of appeals ranging from the smallest, six judges on the First Circuit,[4] to the second largest, seventeen judges on the Fifth Circuit,[5] the full court sits en banc whenever a majority of that court has determined that a three-judge panel decision merits rehearing.

When Congress enlarged the Ninth Circuit from thirteen to twenty-three judges in 1978, it also authorized any court of appeals with more than fifteen active judges to "perform its en banc function by such numbers of members of its en banc court as may be prescribed by rule of the court...." Omnibus Judgeship Act of Oct. 20, 1978, Pub.L. No. 95–486, § 6, 92 Stat. 1629, 1633 (codified at 28 U.S.C. §§ 41 note, 46(c)). Pursuant to this congressional authorization, the Ninth Circuit adopted the eleven-judge limited en banc option in 1980. See Ninth Circuit R. 35–3. Neither of the other eligible circuits has done so.

This is only the third time, according to published orders, that our court has had a vote on whether to rehear a case by the full court. None of the three efforts has been successful. In 1980, the court failed to rehear a nine-judge decision[6] after the court was increased by ten judges to twenty-three. See United States v. Penn, 647 F.2d 876, 889–91 (9th Cir.) (individual dissents from

failure to grant rehearing en banc by full court by Judges Fletcher, Pregerson, and Ferguson), cert. denied, 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980). In 1994, a judge called for rehearing by the full court in Campbell v. Wood, where an eleven-judge limited en banc court held by a six-to-five vote that hanging, as a form of execution of the death penalty, did not violate the Eighth Amendment prohibition against cruel and unusual punishment. See Campbell v. Wood, 20 F.3d 1050, 1051, 1053 (Part II) (9th Cir.) (Reinhardt, J., dissenting from failure to grant rehearing en banc by full court), cert. denied, — U.S. ——, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994).

Judge Reinhardt urged in his dissent from full court rehearing in Campbell that the issue in that case was of the utmost constitutional importance and that it was wrongly decided. 20 F.3d at 1053. The same principles apply to this case, but with even greater force. In contrast to Campbell which simply followed existing law, affirmed the validity of the Washington statute, and made no new constitutional pronouncements, Compassion discovers and enunciates a new constitutional right, not found in the text of the Constitution or even hinted at in any Supreme Court opinion since 1791. In my view, such a solemn and sweeping declaration, particularly when it strikes down the existing statutes and common law of eight out of the nine states of this circuit, should not be undertaken without the express approval of a majority of the members of this court. The public's confidence in the legitimacy of judicial nullification of the will of the electorate is at stake, especially when only one-third of the eligible members of the court has signed on to the holding in this case.

Yet, while disappointing, it is not surprising that we will not rehear this case as a full court. Although one can only speculate, the motives for declining rehearing by the full court undoubtedly run a full spectrum.

---

3. See Arthur D. Hellman, *Maintaining Consistency in the Law of the Large Circuit, in* Restructuring Justice 62–70 (Arthur D. Hellman ed., 1990).

4. Maine, Massachusetts, New Hampshire, Puerto Rico, and Rhode Island. 28 U.S.C. §§ 41, 44.

5. Louisiana, Mississippi, and Texas. 28 U.S.C. §§ 41, 44.

6. At the time of the *Penn* decision, there were 10 active members of this court and three vacancies. One of the active judges did not participate in the case.

Some of my colleagues may, of course, be persuaded that the legal analysis made by the eight-judge majority opinion is indeed sound and should not be revisited. There may be those who oppose full court en banc rehearing to avoid further delay in the hope that the Supreme Court will promptly grant certiorari, which the Attorney General of Washington intends to seek, to reverse an embarrassing judicial excess without further ado. Although our Pasadena Courthouse has a courtroom designed for full court en banc rehearings, there may be those who genuinely tremble at the prospect of up to twenty-eight judges looming from three tiers of benches, intimidating the hapless appellate advocates. Some of my colleagues may believe that full court en banc rehearing should never occur in any case; there may be those who believe that the court elected in 1980 to use the limited (eleven-judge) en banc *in lieu of* a full court en banc.[7] And there may be those who, knowing that we have never voted to rehear a case before the entire court since the procedure was established in 1980, fear the disruptive effect which such an event could have on the current congressional efforts to split the circuit or, as presently cast, to establish a commission to examine the realignment of the appellate courts in this country.

Notwithstanding all the foregoing reasons which might possibly have contributed to the decision not to rehear this case as a full court, I respectfully submit that they are outweighed by our obligation to sustain the integrity of this court in the face of a shockingly broad act of judicial legislation.

## II

Contrast this case with the Oregon experience. Unlike the voters of the State of Washington, the electorate in Oregon passed a ballot measure which specifically provided for a regime of physician-assisted suicide and set forth specific procedural safeguards.[8]

When such a statute is reviewed by this court, it enjoys the benefit of presumptive constitutionality because it has been duly enacted into law through the legislative process. Indeed, the constitutionality of the Oregon statute will soon be tested in this court in the appeal of *Lee v. Oregon,* 891 F.Supp. 1429 (D.Or.1995) (calendared for appeal before Ninth Circuit, July 9, 1996).

Unlike the *Compassion* majority, I will not comment on the merits of another case pending before our court. *Compassion in Dying v. Washington,* 79 F.3d 790, 837–38 (9th Cir. 1996) (en banc) (declaring that the district court "clearly erred" in *Lee* ); *see Lee v. Oregon,* No. 94–6467, at 8 n.7 (D.Or. May 9, 1996) (unpublished order denying motion to lift or stay injunction) ("the state defendants agree with plaintiffs that the Ninth Circuit's comments about *Lee* in *Compassion in Dying* decision were dicta 'and could be considered gratuitous and inappropriate' "). What is significant, however, in the context of *Compassion,* is that the federal judge in Oregon "did *not* hold that states, including Oregon, are precluded from passing laws legalizing physician assisted suicide for terminally ill patients." *Lee,* No. 94–6467, at 24 (emphasis added). The point is that Oregonians did not need the "good offices" of the Ninth Circuit to make their legislative decision. Because of the *Compassion* majority, however, eight other states have had such legislation imposed upon them by court edict and, thus, have been deprived of their own right to choose.

By exempting an ill-defined class from Washington's statutory prohibition against assisted suicide, the majority simply appropriates the legislative power of the State of Washington. As Judge Kleinfeld eloquently writes: "That a question is important does not mean that it is constitutional. The Founding Fathers did not establish the United States as a democratic republic so that elected officials would decide trivia, while all

---

7. Interestingly enough, the language of the limited en banc option statute is capable of such interpretation. *See* 28 U.S.C. §§ 41 note, 46(c). On balance, however, the context of our rule and the orders which implement it support the conclusion that our court never intended to renounce full court en banc in favor of a single limited en banc rehearing. *See* Ninth Cir. General Order 5; Ninth Cir.R. 35–3.

8. Measure 16 (codified as Or.Rev.Stat. §§ 127.800–127.995).

great questions would be decided by the judiciary." *Compassion,* 79 F.3d at 857, 858 (Kleinfeld, J., dissenting).

Indeed, the plaintiff-physicians in *Compassion* present a strong legislative argument, but one that is best addressed to the popularly elected representatives of Washington, who are more capable than we of deciding whether to recognize the exception desired by the plaintiffs here. *See Compassion,* 79 F.3d at 839, 857 (Beezer, J., dissenting) ("To declare a constitutional right to physician-assisted suicide would be to impose upon the nation a repeal of local laws .... [and to] usurp states' rights to regulate and further the practice of medicine....").

The difference between the Oregon and Washington experiences is compelling. In Oregon, the people acted out of their own free will to legislate; in Washington, the will of this court is imposed on the people contrary to their manifest intent.

## III

As to the merits of this case, the eight-judge opinion in *Compassion* simply goes too far for an inferior federal court restricted to following Supreme Court precedent. With utmost respect to my eight colleagues, I am convinced that by misapplying language uniquely crafted by the Supreme Court for application in circumstances wholly inapposite to those presented here, the opinion usurps the state legislative function, and in so doing silences the voice of the people of Washington and defies the Supreme Court's call for judicial restraint in the area of substantive due process.[9]

The majority fundamentally errs by resting its holding on obvious distortions of the language in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), and *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). As the Second Circuit

recently concluded: "The right to assisted suicide finds no cognizable basis in the Constitution's language or design, even in the very limited cases of those competent persons who, in the final stages of terminal illness, seek the right to hasten death." *Quill v. Vacco,* 80 F.3d 716, 724–25 (2d Cir. 1996); *accord Compassion,* 79 F.3d at 857 (Fernandez, J., dissenting) ("no one has an even nonfundamental *constitutional right* to become what our legal ancestors pithily denominated a *felo de se* "); *People v. Kevorkian,* 447 Mich. 436, 527 N.W.2d 714, 728 (1994) ("We disagree with [the district court in *Compassion* ] that either *Cruzan* or *Casey* preordains that the Supreme Court would find that any persons, including the terminally ill, have a liberty interest in suicide that is protected by the Fourteenth Amendment."), *cert. denied,* —— U.S. ——, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995).

### A

It is clear that the *Casey* Court upheld the right to abortion more on the basis of *stare decisis* than on a reasoned reaffirmation of the notion that abortion is a protected liberty interest. *See Casey,* 505 U.S. 833, 870–72, 112 S.Ct. 2791, 2817 (joint opinion of Justices O'Connor, Kennedy, and Souter) ("after nearly 20 years of litigation in *Roe*'s wake we are satisfied that the immediate question is not the soundness of *Roe*'s resolution of the issue, but the precedential force that must be accorded to its holding"). Furthermore, the *Casey* Court *retreated* from the central holding of *Roe* [10] by rejecting the notion that abortion is a fundamental right triggering heightened judicial scrutiny. *See Casey,* 505 U.S. at 943–44, 952–54, 112 S.Ct. at 2855, 2860 (Rehnquist, C.J., dissenting) (describing the joint opinion). Considering the Court's refusal to reaffirm the entire holding of *Roe* on the merits, and in light of the utter lack of any *stare decisis* roots for the right to assisted suicide, it plainly appears that *Casey* is a perniciously thin reed

9. *See, e.g., Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992) ("The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new

ground in [the area of substantive due process].").

10. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

upon which to rest the majority's radical holding.

The majority draws an absurd parallel between a person's decision to enlist a doctor's aid in the termination of her own life and a woman's decision to terminate a pregnancy. The majority grounds this novel marriage of two wholly inapposite situations in the poetic language of *Casey*, in which the Court described an abortion decision as "involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy." *Casey*, 505 U.S. at 851–53, 112 S.Ct. at 2807; *see Compassion*, 79 F.3d at 813–14. Engaging in one of the most egregious judicial leaps, the majority discovers a right to assisted suicide by simply concluding that such a right involves "'one of the most intimate and personal choices a person may make in a lifetime....'" *Compassion*, 79 F.3d at 813–14.

The majority's method of constitutional interpretation lays the foundation for the discovery of an endless parade of protected liberty interests involving choices that could be cast as "intimate" and "personal." If physician-assisted suicide is a protected "intimate and personal choice," why aren't polygamy, consensual duels, prostitution, and, indeed, the use of illicit drugs? Furthermore, if assisted suicide is so clearly protected by the Constitution, why immunize only the physician and those acting under a physician's supervision? [11] Why wouldn't the Constitution also immunize family members or friends who profess compassion for the dying and act without consulting a physician? Indeed, isn't the *Compassion* holding the first tangible step down the very "slippery slope" we were assured *Roe* never authorized?

**B**

The majority goes on to err by concluding that there is no constitutionally permissible distinction between suicide and refusing medical treatment; such a conclusion ignores a long line of judicial decisions that recognize the distinction.[12] The right to refuse medical treatment is grounded in the common law right to be free of unwanted bodily contact; in contrast, the common law has never recognized a right to assistance in deliberately taking one's life. The removal of life-support is not the actual cause of death; there, death results from natural causes. *See* Stephen Carter, The Culture of Disbelief 236 (1993) ("[assisted suicide] involves not *letting* the patient die, but *making* the patient die").

---

11. *See, e.g.,* Daniel Q. Haney, *Nurses Admit They Hasten Deaths*, Wash.Post, May 23, 1996, at A13 (reporting that survey published in *The New England Journal of Medicine* reveals that one in five intensive-care nurses responding to survey admitted hastening deaths of terminally ill patients, sometimes acting contrary to physician's orders but out of compassion for the patient at the urging of the patient or family members).

12. *See, e.g., Superintendent of Belchertown v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417, 426 n. 11 (1977) (distinguishing an act of intentional self-destruction from "a competent, rational decision to refuse treatment when death is inevitable"); *People v. Kevorkian*, 447 Mich. 436, 527 N.W.2d 714, 728 (1994) ("whereas suicide involves an affirmative act to end a life, the refusal or cessation of life-sustaining medical treatment simply permits life to run its course, unencumbered by contrived intervention"), *cert. denied*, —— U.S. ——, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995); *McKay v. Bergstedt*, 106 Nev. 808, 801 P.2d 617, 626 (1990) (concluding that there is a difference "between choosing a natural death summoned by an uninvited illness or calamity and deliberately seeking to terminate one's life by resorting to death-inducing measures unrelated to the natural process of dying"); *Matter of Quinlan*, 70 N.J. 10, 355 A.2d 647, 665

("We would see ... a real distinction between the self-infliction of deadly harm and a self-determination against artificial life support ... in the face of irreversible, painful and certain imminent death."), *cert. denied sub nom. Garger v. New Jersey*, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); *Bouvia v. Superior Court*, 179 Cal.App.3d 1127, 225 Cal.Rptr. 297, 306 (1986) ("[A] decision to allow nature to take its course is not equivalent to an election to commit suicide with real parties aiding and abetting therein."); *see also* New York State Task Force on Life and the Law, *When Death is Sought: Assisted Suicide and Euthanasia in the Medical Context* 71 (May 1994) ("The imposition of life-sustaining medical treatment against a patient's will requires a direct invasion of bodily integrity and, in some cases, the use of physical restraints, both of which are flatly inconsistent with society's basic conception of personal dignity.... It is this right against intrusion—not a general right to control the timing and manner of death—that forms the basis of the constitutional right to refuse life-sustaining treatment. Restrictions on suicide, by contrast, entail no such intrusions, but simply prevent individuals from intervening in the natural process of dying.").

The majority compounds its error by dramatically expanding the narrow holding of *Cruzan,* 497 U.S. 261, 110 S.Ct. 2841 (holding that Constitution does not forbid Missouri from requiring clear and convincing evidence of an incompetent's wishes as to the withdrawal of life-sustaining treatment). The *Cruzan* Court merely "assume[d] for purposes of this case" that a competent person does have "a constitutionally protected right to refuse lifesaving hydration and nutrition." *Id.* at 279, 110 S.Ct. at 2852; *see* 2 Alan Meisel, The Right to Die § 18.22, at 498 (2d ed. 1995) ("the *Cruzan* opinion proceeded on *assumptions,* not holdings, about the rights of competent patients").

In *Cruzan,* the Supreme Court in no way offered support for the recognition of a right to assisted suicide. In fact, the Court not only emphasized that a state has an undeniable interest in the protection and preservation of human life, but also specifically noted that "the majority of States in this country have laws imposing criminal penalties on one who assists another to commit suicide." *Id.* at 280, 110 S.Ct. at 2852. The hesitancy and narrowness of the *Cruzan* holding should have given the majority pause in its endeavor to recognize a new right under the Due Process Clause; instead, the majority inexplicably heralds the highly limited language of *Cruzan* as a "powerful precedent" in support of the right to assisted suicide.

## C

Contrary to the conclusions contained in the majority's lengthy exegesis, neither the Constitution nor history supports the notion that this court may compel the State of Washington (and eight other western states) to recognize an individual's right to physician-assisted suicide.

Considering the pains to which the majority has gone to assert the redemptive nature of Judas Iscariot's suicide and to attribute utilitarian motivations to St. Augustine's writings on suicide,[13] I feel obliged to observe that no amount of historical revisionism can cure the constitutional infirmities that plague the majority's holding. Moreover, the majority's extensive discussion of historical attitudes toward suicide is beside the point; the proper focus should be on whether a right to *assisted* suicide is rooted in American history and tradition. Clearly it is not. See, e.g., *Cruzan,* 497 U.S. at 292–94, 294–96, 110 S.Ct. at 2859, 2860 (Scalia, J., concurring) ("Case law at the time of the adoption of the Fourteenth Amendment generally held that assisting suicide was a criminal offense."); *Quill,* 80 F.3d at 724 ("Nor can it be said that the right to assisted suicide claimed by plaintiffs is deeply rooted in the nation's traditions and history. Indeed, the very opposite is true.").

The most comprehensive study available on the history of suicide unequivocally concludes that "the weight of authority in the United States, from colonial days through at least the 1970s has demonstrated that the predominant attitude of society and the law has been one of opposition to suicide. It follows that courts should not hold suicide or its assistance to be a protected right under the United States Constitution." Thomas J. Marzen et al., *Suicide: A Constitutional Right?,* 24 Duq.L.Rev. 1, 100 (1985).[14]

The Supreme Court has never recognized a substantive due process right without first finding that there is a tradition of protecting that particular interest. Here, there is absolutely no tradition of protecting assisted suicide. Almost all states forbid assisted suicide and some states even permit the use of nondeadly force to thwart suicide attempts. No state has ever accepted consent of the victim as a defense to a charge of homicide. These are the political judgments made by the democratic process; if they are no longer "politically correct," let the legislatures act to change them, not life-tenured judges immune from the voters' reach.

## IV

Finally, let no one be beguiled into misconceptions concerning *Compassion*'s actual

---

13. *See Compassion,* 79 F.3d at 808 & n. 25.

14. Although the 8-judge opinion contains numerous citations to this study, the opinion is careful to omit any mention of the study's conclusion.

**1446**

holding; this case is *not* about aggressive pain management.

Long before the eight-judge opinion was issued, pain treatments—such as the injection of morphine—have been legal and well-established in the medical community. *See* American Medical Ass'n, Current Opinions of the Council on Ethical & Judicial Affairs, Code of Medical Ethics § 2.20, at 14 (1992) ("For humane reasons, with informed consent, a physician may do what is medically necessary to alleviate severe pain, or cease or omit treatment to permit a terminally ill patient to die when death is imminent. However, the physician should not intentionally cause death.").

Furthermore, no physician has ever been imprisoned for properly prescribing pain killers. It is common knowledge that physicians, with the tacit consent of the family, may over-medicate for pain with the risk of accelerating death. So long as the primary intention is to lessen pain, there is no danger of imprisonment. As Judge Kleinfeld emphasizes, under these circumstances, there is a fundamental distinction between putting one in harm's way and intending death:

> Knowledge of an undesired consequence does not imply that the actor intends that consequence. A physician who administers pain medication with the purpose of relieving pain, doing his best to avert death, is no murderer, despite his knowledge that as the necessary dosage rises, it will produce the undesired consequence of death.

*Compassion,* 79 F.3d at 858 (Kleinfeld, J., dissenting). Clearly, *Compassion*'s constitutionalization of the right of physicians to prescribe lethal doses for the express purpose of ending the lives of their consenting patients goes far beyond the most aggressive, medically approved pain treatments.

## V

The eight-judge majority has not sustained its burden of proving that the Constitution compels a state to recognize, against the will of its people, a right to assisted suicide. However much judges, as individuals, may desire such a right for the terminally ill, we, as judges, are limited by the text of the Constitution and by the Framers' clear intent that the judiciary be "disassociated from direct participation in the legislative process." *See Dennis v. United States,* 341 U.S. 494, 517, 552, 71 S.Ct. 857, 871, 889, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring). In the words of Justice Frankfurter: "Our duty to abstain from confounding policy with constitutionality demands perceptive humility as well as self-restraint in not declaring unconstitutional what in a judge's private judgment is deemed unwise and even dangerous." *Id.* at 552, 71 S.Ct. at 889.

The constitutionalization of a right to physician-assisted suicide is nothing short of pure invention—constitutionally untenable and historically unprecedented. It is especially egregious when only eight of the twenty-four active judges on our court can nullify the will of the voters of Washington who rejected a physician-assisted suicide law just five years ago.

I respectfully dissent from this court's improvident refusal to grant rehearing en banc by the full court.

TROTT, Circuit Judge, with whom Circuit Judges O'SCANNLAIN and KLEINFELD, concur, dissenting from the order rejecting the request for rehearing en banc by the full court.

## I

Liberty is not the mere absence of restraint, it is not a spontaneous product of majority rule, it is not achieved merely by lifting underprivileged classes to power, nor is it the inevitable by-product of technological expansion. It is achieved only by a rule of law.

Jackson, Justice Robert H., The Supreme Court in the American System of Government 76 (1955).

No magician—not David Copperfield, not even Harry Houdini—can produce a rabbit from a hat unless the rabbit is in the hat to begin with. Moreover, if a hat does not contain such an animal, a magician cannot claim that anything he is able to produce from it is in fact a rabbit, no matter how sincere he may be or how great his forensic

skills. All of this has something to do with basic physics.

But law may not be physics, as Judge Reinhardt's opinion on behalf of our en banc court demonstrates, because, with all respect, he has in fact succeeded in pulling a nonexistent liberty interest out of thin constitutional air, a liberty interest that certainly does not exist in the document itself. I honestly applaud his splendid effort, which is most skillful and elegant, but unfortunately his production is not law either, it is simply constitutional sleight of hand. Maybe some of us or even many of us would like to see this rabbit in the hat because we believe it's a nice rabbit—hope is an ever-present temptress in a world of woe—but *we* do not get to change the Constitution any more than we get to change physics. Roger Traynor, the influential former Chief Justice of the California Supreme Court, offered the suggestion that

> "one entrusted with decision ... must also rise above the vanity of stubborn preconceptions, sometimes euphemistically called the courage of one's convictions. He knows well enough that he must disconnect his own predilections, of however high grade he regards them, which is to say he must bring to his intellectual labors a cleansing doubt of his omniscience...." [1]

Certainly our job is to interpret the Constitution and to apply its principles and purposes in a modern setting, but we must also take great care not to cross over into *rewriting* the Constitution. That profound privilege and right belongs to the People, not to us. This line, of course, has nothing to do with physics, it has to do with our assigned constitutional role in our republican form of government as enshrined in our oath of office. It is a line sometimes fuzzy and one about which reasonable judges might disagree, but as Edmund Burke once said, "Though no man can draw a stroke between the confines of day and night, yet light and darkness are upon the whole tolerably distinguishable."

The jurisprudential significance of this case has far more to do with our role and power as federal judges than with the merits or desirability of physician-assisted suicide.

The issue most deserving of attention is whether we have exceeded our lawful interpretative power to remind the democratic process what it can and cannot do.

## II

Passive euthanasia, or letting death run its course, is one thing, and suicide another, but active euthanasia, or permitting one person to kill another—even at that person's competent request—seems massively different. This difference is lost in Judge Reinhardt's approach to this case as reflected in the questionable manner in which he states the issue: whether "there is a constitutionally-protected liberty interest in determining the time and manner of one's own death," or whether there is a "right to die." These alternative statements are at odds with the Supreme Court's admonition that " '[s]ubstantive due process' analysis must begin with a careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.' " *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992)).

The active involvement of a person other than the inchoate decedent cannot be excluded from the statement of the constitutional issue in this case. It is the very involvement of this second person as the agent of death—a state licensed physician no less—that adds a critical and irreducible dimension to the issue, a dimension that does not belong in the wings. To relegate this definitive aspect of the question to a subsidiary phase of the analysis strikes me as analytically unsound. After all, what are we *really* talking about? It is the alleged right to have *another* person end one's own life. My colleague Judge Noonan is correct when he says that "this case is about the role of physicians in bringing about death."

I note with great interest that this alleged right is derivatively asserted by persons *other* than the now deceased patients them-

1. R. Traynor, "Reasoning in a Circle of Law," 56 Va.L.Rev. 739, 750–51 (1970).

selves, i.e., their doctors; and this observation fuels my belief that the broad level of generality or abstraction at which Judge Reinhardt casts the issue is inappropriate and misleading. In substance, he slips the rabbit into the hat so he can later produce it as though it was there all the time.

The "careful description of the asserted right" called for in *Reno v. Flores* has an important purpose. A certain specificity and accuracy of focus enables us correctly to apply the required analysis to the assertion, and it avoids turning the Constitution into a friendly mirror in which we simply see our own predilections, or just a blank check. Constitutional rights are usually expressed in grand terms, but the terms must not be so broad that they fail to give notice as to what they encompass, especially if no textual language suggests their existence.

Given Judge Reinhardt's broad approach to the Constitution, I suppose he would complement his liberty interest right to die with an equally broad substantive right to live; and that a right to live surely encompasses a right to breath. Does this then become for example, the starting point in all environmental cases involving the trees that produce our atmosphere's oxygen? Are we going to balance logging programs against a liberty interest in life? On the basis of a right to breath, what new rights do I have against threats to the ozone layer? Can I invoke a general right to move against traffic laws? A right to eat against the IRS's attempt to collect taxes? If the substantive due process liberty interest in determining the method of our own death is so weighty, why cannot it be claimed by a motorcycle rider as a balancing interest against helmet laws? The silliness of these examples is not intended to trivialize the weighty issue of physician-assisted suicide, but to expose the error inherent in casting a legal issue too broadly.

Thus, I believe the majority of the three-judge panel was correct in its statement of the issue as whether there exists "a constitutional *right to aid* in killing oneself." When looked at through *this* prism, the line between interpreting and rewriting is "tolerably distinguishable." Killing someone has usually been regarded as murder, unless done in self-defense, et cetera. Yet all of a sudden, a kind of killing that has traditionally been outlawed—assisted suicide is prohibited in forty-five states plus the District of Columbia—becomes enveloped in a liberty interest protected by the Constitution as a right.

### III

Justice White has issued on behalf of the Supreme Court a doctrinal warning we should heed, not just because he said it, but because he is correct:

> The court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution. That this is so was painfully demonstrated by the face-off between the Executive and the Court in the 1930's, which resulted in the repudiation of much of the substantive gloss that the Court had placed on the Due Process Clauses of the Fifth and Fourteenth Amendments. There should be, therefore, great resistance to expand the substantive reach of those Clauses, particularly if it requires redefining the category of rights deemed to be fundamental. Otherwise, the Judiciary necessarily takes to itself further authority to govern the country without express constitutional authority. The claimed right pressed on us today falls far short of overcoming this resistance.

*Bowers v. Hardwick,* 478 U.S. 186, 194–95, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986).

As well written, as erudite, and as seductive as Judge Reinhardt's opinion is on behalf of his school of constitutional interpretation, it conjures up an illusion with "no cognizable roots in the language or design of the Constitution." As such, and with all respect to the panel, the opinion is a well-intentioned and well-meaning tour de force, but illegitimate nonetheless. What *is* deeply rooted and still prevailing in our traditions is a strong aversion, both moral and legal, against the taking of a life of another. From the earliest days of recorded history, one of our most enduring secular principles has enjoined the killing of a fellow human being. Our Constitution pro-

tects life, not death. If assisted euthanasia is to be a protected liberty interest, then let the People put it in the Constitution.

Decisions like this are frequently accompanied by a discussion of the "slippery slope" principle. This case suggests, however, that we are not just on a slippery slope, but in a state of constitutional free fall resulting from what Dean Erwin Griswold called "decisional leapfrogging":

> the first decision is distilled from the language of the Constitution, but the next expansion begins from the reasoning of the last decision, and so on down the line until we reach a point where the words of the Constitution are so far in the background that they are virtually ignored. In the end, we may be left with a rationale that comes to little more than, "Well, it really is a good idea. We want a free society where all of these things can be done and we want to keep the Government off the backs of the people." There are governmental processes for bringing such results about, but it is hard to think that such adumbrations of the Constitution are an appropriate exercise of judicial power.[2]

I repeat, again with all respect to the en banc court, their decision has *rewritten* the Constitution, not interpreted it. The supposedly least dangerous branch has usurped the right of the People in a sovereign state to make their own laws, including their right to draft their own Constitution and to decide upon which areas of life the majority shall not trespass. This en banc decision and the manner in which it treats the Constitution and the role of federal judges sounds a sour note in the careful orchestration of our harmonious institutions and our republican form of government. Shorn of its Corinthian decor, it is nothing less than an act of judicial imperialism of the very kind that threatened the independence of the Supreme Court in the 1930's. When we face political questions in legal form, we must give legal answers, not political ones.

The decisions made by the legislative organs of our government are not always to our liking. In fact, some of us on occasion may think they are abhorrent. Some values possibly should be in our Constitution, but are not. But what sets us apart from other forms of government is our belief in process. We are a nation of laws, not of leaders. Whenever we override democratic choice as we have done here, we are just a naked power organ unless our warrant to do so manifests itself in the Constitution. The right to assisted euthanasia does not, not in the text of the original document or its interstices, not in the thinking or purpose of those who drafted the Fourteenth Amendment, and not in our traditions, customs, or history. Not a word supporting the existence of this "right" can be found in the records of any of the recognized sources of constitutional illumination.

If this supposed liberty interest cannot be found in any of these sources or anywhere in *our* history or traditions, where else is there to look? Where does this amorphous approach to substantive due process rights end? The majority opinion reads like a celebration of "natural law." Judge Reinhardt's revealing use of the Harris poll and the Roper Report as a source of constitutional enlightenment strikes me as particularly inappropriate. The Constitution's explicit provisions for amendment rely on government process, not on random sampling of public opinion. Polls are for the other branches of our government, not for the judiciary. Equally irrelevant is his observation that a retired Justice Powell said he probably made a mistake in *Bowers v. Hardwick.*

No matter where we stand on the range of our interpretive power, the supreme function of a judge is to recognize that there must be limits to our writ. Even those celebrated advocates of sociological jurisprudence who delivered us from the grip of the 19th century's rigidly mechanical approach to the law recognized clear limits to their authority as jurists. Justice Oliver Wendell Holmes, for example, said, "I recognize without hesitation that judges do and must legislate, but they only do so interstitially; they are confined

---

**2.** Erwin N. Griswold, "The Judicial Process." 31 Fed.B.J. 309, 317 (1972).

from molar to molecular motions." [3] Justice Benjamin Cardozo put it this way:

> "[A judge] is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness.... He is not to yield to spasmodic sentiment, to vague and unregulated benevolence." ... "Judges have ... the power, though not the right to travel beyond the walls of the interstices, the bounds set to judicial innovation by precedent and custom. Nonetheless, by that abuse of power, they violate the law." [4]

Even more appropriate for a controversial polycentric issue involving the active taking by a state licensed medical doctor of the life of a gravely ill yet somehow competent person are the words of Justice William O. Douglas:

> The changes suggested implicate so many policies and raise so many problems of a political, economic, and social nature that it is fit that the Judiciary recuse itself. At times judges must legislate "interstitially" to resolve ambiguities in laws. But the problem of taking all or some alien commuters engaged in farm work out of the Act is not "interstitial" or as Mr. Justice Holmes once put it "molecular." It is a massive or "molar" action for which the judiciary is ill-equipped. [5]

If the only limit on our authority is the grandiloquence of our rhetoric, then we live by fiat of the judiciary. Dean Griswold called this, "Justice as administered by Harun al Rashid sitting under a tree. As Cardozo said, 'That might result in a benevolent despotism if the Judges were benevolent [people].'" [6] As Francis Bacon said in 1625, "This office is *jus dicere*, not *jus dare*, to interpret law, and not to make law or to give law." Francis Bacon, Of Judicature, in Essays Civil and Moral (58 Murphy's ed. 1826) (1625). If the difference is not tolerably

discernible, trouble may become our middle name. Is our independence at stake? Archibald Cox gave us his answer to this question in 1987, an answer that may partially explain the Senate's aggressive approach to judicial confirmation hearings:

> The style of constitutional interpretation and the traditional independence of the judiciary from political pressure and responsibility are interrelated. If the process of decision making is excessively politicized, there will be additional pressure to choose judges who will cast their votes on grounds of policy. Such choices, in turn, would make the style of decision making still more political, in both fact and public perception. The heightened perception would fuel still further demand. The cycle would inevitably lead to demands for the election of justices and judges. If the key court decisions are little different from the determinations of policy by other branches of government, why should not the voters elect the justices and judges for terms of years? [7]

As Judge Learned Hand said,

> [The judge's] authority and immunity depend upon the assumption that he speaks with the mouth of others: The momentum of his utterance must be greater than any which his personal regulation and character can command, if it is to stand against the passionate resentments arising out of the interests he must frustrate. [8]

As did the framers, I prefer Justice Jackson's liberty of law to the protection of a benevolent dictator or a monarch, or of an unbridled federal judiciary where sooner or later power corrupts, and ... you know the rest. I have the greatest admiration for my friend Judge Reinhardt and for the en banc court majority, able and dedicated jurists all, but on this issue, I respectfully disagree with their approach and their judgment. *We* have

---

**3.** *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting).

**4.** Benjamin N. Cardozo, "The Nature of the Judicial Process," 129, 141 (1921).

**5.** *Saxbe v. Bustos,* 419 U.S. 65, 79–80, 95 S.Ct. 272, 281–82, 42 L.Ed.2d 231 (1974).

**6.** Erwin N. Griswold, "The Judicial Process." 31 Fed.B.J. 309 (1972).

**7.** Archibald Cox, "The Court and the Constitution" (1987).

**8.** L. Hand, *Mr. Justice Cardozo,* 52 Harv.L.Rev. 361 (1939).

an obligation to undo this mistake, not to expect the Supreme Court to clean up our excesses.

Thus, I respectfully dissent from our decision not to rehear this landmark case sitting as a full court en banc.[9]

9. I am indebted to our colleague Ruggero J. Aldisert and to his new book "The Judicial Process" (Second Edition) as a source of education and inspiration.